STATE of Missouri, Respondent,

v.

Walter Timothy STOREY, Appellant.

No. 74425.

Supreme Court of Missouri,
En Banc.

June 20, 1995.

Rehearing Denied July 25, 1995.

Janet M. Thompson, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Theodore A. Bruce, Asst. Atty. Gen., Jefferson City, for respondent.

BENTON, Judge.

The jury convicted Walter Timothy Storey of first-degree murder and other crimes, and assessed the punishment as death. The circuit court imposed the punishment of death, and for the other crimes, life imprisonment, seven years, and five years. The motion court denied Storey's Rule 29.15 motion for post-conviction relief. This Court has jurisdiction of this consolidated appeal. *Mo. Const. art. V, § 3.* The convictions and the sentences other than death are affirmed; the denial of Rule 29.15 relief and the punishment of death are reversed, and the case is remanded.

## I.

This Court reviews the facts in the light most favorable to the verdict. *State v. Shurn,* 866 S.W.2d 447, 455 (Mo. banc 1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994).

On February 2, 1990, Storey received a divorce petition from his wife. Later that night, by his own admission, Storey got a knife from his kitchen, climbed up the balcony of his across-the-hall neighbor Jill Frey, entered her apartment, took her pocketbook and car keys, "struggled" with her, and stole her car.

The next day, again by his own admission, Storey reentered Frey's apartment using the stolen keys, tried to wipe his fingerprints from anything he had touched, cleaned under Frey's fingernails with her own toothbrush, put evidence in a dumpster, and threw Frey's keys in the lake behind her apartment.

The day after that, Frey failed to appear at work, so her co-workers came to check on her. They found Frey's dead body in the bedroom. She had six broken ribs; she had been hit in the face and head 12 times; she had a non-fatal stab wound in her side. Most or all of these injuries were inflicted before she was killed by two six-inch cuts across her throat.

## II. Jury Issues

### A. Juror Pamphlet

The circuit court routinely mails to potential jurors an informational pamphlet pro-

duced by the Missouri Bar. Storey argues the court plainly erred by distributing the pamphlet, and that trial counsel was ineffective by not objecting to it.

Storey equates the pamphlet with jury instructions, arguing that these two pamphlet "instructions" misstate the law:

1. You should remember that statements of the lawyers are not evidence, but only explanations of what each side claims, and that claims must be proved by evidence.

2. ... whereas in a criminal case the verdict must be unanimous.

■■■ A jury instruction is a "direction given by the judge to the jury concerning the law of the case." *Black's Law Dictionary* 856 (6th ed. 1990). The informational pamphlet is not a jury instruction. Jurors are presumed to follow actual instructions—those received from a judge in court. *See Zafiro v. United States,* —— U.S. ——, ——, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993).

■■■ Moreover, Storey has failed to produce any evidence of prejudice, relying on "a presumption of prejudice when a non-MAI instruction is used." In fact, there is no such presumption; rather, "[t]he giving or failure to give an [non-MAI] instruction or verdict form ... shall constitute error, its prejudicial effect to be judicially determined." *Rule 28.02(f).* On this record, there is neither plain error nor prejudice. Finally, in the absence of any showing of prejudice, Storey cannot prevail on the ineffective-assistance claim. *See Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *State v. Wise,* 879 S.W.2d 494, 524 (Mo. banc 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995).

## B. Individual or Small–Group Voir Dire

Storey claims a constitutional right to individual or small-group voir dire on death qualification and pretrial publicity.

■■ Control of voir dire is within the discretion of the trial judge; only abuse of discretion and likely injury justify reversal. *State v. Bannister,* 680 S.W.2d 141, 145 (Mo. banc 1984), *cert. denied,* 471 U.S. 1009, 105 S.Ct. 1879, 85 L.Ed.2d 170 (1985). This Court has repeatedly rejected claims for individual or small-group voir dire on death qualification. *See State v. Chambers,* 891 S.W.2d 93, 102 (Mo. banc 1994); *State v. McMillin,* 783 S.W.2d 82, 94–95 (Mo. banc), *cert. denied,* 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990).

■■ As to publicity, the trial judge asked the venire about their knowledge of the case. Several venirepersons had heard about it; they were individually questioned at the bench. Those who had prejudged the case or could not be impartial were excused for cause. This individual questioning of those who indicated knowledge was not an abuse of discretion.

## C. For–Cause Excusals

Storey contends the trial court erred in excusing for cause venirepersons Grissom and Hayden and that counsel was ineffective in failing to object when Grissom was excused.

■■■ A defendant's right to an impartial jury is violated when the trial court excuses venirepersons for cause merely because they express objections to the death penalty. *Wainwright v. Witt,* 469 U.S. 412, 416, 105 S.Ct. 844, 848, 83 L.Ed.2d 841 (1985); *State v. Harris,* 870 S.W.2d 798, 805 (Mo. banc), *cert. denied,* —— U.S. ——, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994). Venirepersons *may* be removed for cause if their views would substantially impair their ability to follow the law. *Wainwright,* 469 U.S. at 425–26, 105 S.Ct. at 852–53; *Harris,* 870 S.W.2d at 805. Appellate courts review for-cause rulings only for abuse of discretion. *Harris,* 870 S.W.2d at 805–06.

■■■ Grissom said he would "exclude the death penalty even as a possibility" and "I believe God gives life; He's the only one that should take it." Plainly, these statements demonstrate Grissom's inability to follow the law. Nonetheless, Storey argues that excusing Grissom violates Mo. Const., art. I, § 5, prohibiting disqualification from jury service because of religious beliefs. Excusing a venireperson who cannot follow the law does not violate § 5, even if the reason

for the inability is a religious belief. *See State v. Sandles,* 740 S.W.2d 169, 178 (Mo. banc 1987), *cert. denied,* 485 U.S. 993, 108 S.Ct. 1303, 99 L.Ed.2d 513 (1988). Thus, the trial court did not err in excusing Grissom, and counsel's decision not to object was not ineffective.

■■■ Venireperson Hayden, after twice stating she could impose the death penalty only in "very limited circumstances," said:

> I could judge guilt or not guilty with no problem, I can listen to the evidence of the special circumstance, but I guess I'm just saying that even if the special circumstance fits the law, in my mind, it has to be an extraordinary special circumstance, and, yes, I might—you know, I couldn't envision doing it for all special circumstances.

Hayden's testimony established that her views on the death penalty substantially impaired her ability to follow the law. She testified that she would apply her own definition of "special circumstances" rather than following the instructions. On this record, the trial court did not abuse discretion in excusing Hayden.

### D. Pre–Trial Prosecutorial Misconduct

■■■ Storey alleges that the trial court erred in not granting a mistrial (*sua sponte,* because no objections were made) when the prosecutor: (1) told the jury the State had to prove the case to the jury's satisfaction (not beyond a reasonable doubt); and (2) asked if the jury could impose death in the proper case. Any imprecision in the prosecutor's reasonable-doubt voir dire was cured by the jury instructions, which properly discussed reasonable doubt (*see* section III.F., below). Asking the venire if they could impose death in the proper case is a permissible question. *See State v. Feltrop,* 803 S.W.2d 1, 19 (Mo. banc), *cert. denied,* 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991).

■■■ Storey also claims that trial counsel was ineffective for failing to object to this voir dire. Since there was no misconduct, there was no ineffective assistance for failure to object.

### E. Pre–Trial Ineffective Assistance

■■■ Storey asserts that the motion court erred in denying post-conviction relief for ineffective assistance of counsel. To prove ineffective assistance, the defendant must show that counsel's performance did not conform to the degree of skill, care, and diligence of a reasonably competent attorney, and that the defendant was thereby prejudiced. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *State v. Wise,* 879 S.W.2d 494, 524 (Mo. banc 1994), *cert. denied,* — U.S. —, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995). To prove prejudice, a defendant must show a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Shurn,* 866 S.W.2d 447, 468 (Mo. banc 1993), *cert. denied,* — U.S. —, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994). Trial strategy is not a ground for ineffective assistance. *Id.*

■■■ The motion court found that trial counsel was not ineffective, so review is to determine if the motion court clearly erred. *Rule 29.15(j); Wise,* 879 S.W.2d at 524. Findings and conclusions are clearly erroneous only if, after a review of the entire record, the appellate court is left with the definite impression that a mistake has been made. *Shurn,* 866 S.W.2d at 468–69.

#### 1. Not Striking Jurors

Storey contends that trial counsel should have moved to strike jurors Duly and Doerrer.

Duly, after the prosecutor asked if any of the venire were crime victims, approached the bench and said:

> I was involved in a child molestation case involving me as a young girl, so I feel very prejudiced against any sexual-related things. I just have a lot of past, you know, memories from anything like that, so when rape is involved or any sexual assault, I tend not to be fair.

The prosecutor conceded there "might be some" sexual assault evidence. The court then questioned Duly:

THE COURT: If you think that anything comes out, you think that would prejudice you?

DULY: I would just tend to—it just depends. It's hard to say, but I just tend to have really bad feelings in that area.

THE COURT: Okay. You understand that each case is on its own—

DULY: Yes, sir, I do.

THE COURT: —and is guided by its own evidence?

DULY: Yes, sir, I do.

THE COURT: And you should be guided by the evidence that's presented in this case from the witness stand and exhibits—

DULY: Yes, sir, I do understand that.

THE COURT: —and follow the Court's instructions, and you think—you think you could do that?

DULY: I think I could give a fair—I've accepted it and, yes, I do think that. I just want it to be known.

THE COURT: Fair to the Defendant and fair to the State?

DULY: Yes, sir

■ On this record, trial counsel was not ineffective for not moving to excuse Duly. The critical question in a bias challenge is whether the venireperson unequivocally indicated an ability to evaluate the evidence fairly and impartially. *State v. Parker,* 886 S.W.2d 908, 919 (Mo. banc 1994), *cert. denied,* — U.S. ——, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995). Duly did. Since there was no legal basis to excuse Duly for cause, trial counsel was not ineffective for failing to seek removal. *See Antwine v. State,* 791 S.W.2d 403, 411 (Mo. banc 1990), *cert. denied,* 498 U.S. 1055, 111 S.Ct. 769, 112 L.Ed.2d 789 (1991).

■ Juror Doerrer said her brother was murdered four years earlier, but indicated that the incident would not impair her ability to be fair and impartial and that she could put the incident aside and be fair to both sides. Doerrer thus unequivocally showed she could evaluate the evidence fairly and impartially. There was no basis to move to excuse her, and no ineffective assistance in

not doing so. *Parker,* 886 S.W.2d at 919; *Antwine,* 791 S.W.2d at 411.

### 2. Pretrial Publicity

Storey argues counsel was ineffective for failing to move for a change of venue and for conducting insufficient voir dire on pretrial publicity issues.

During voir dire, the trial judge noted the publicity the case had received, identified the site of the crime, then asked if anyone had personal knowledge of the incident from media, friends, or law enforcement officers. Eight venirepersons said yes; all were questioned by the judge at the bench (with counsel present). Five of the eight were excused for cause. Three said they had not prejudged the case, could put aside their knowledge, and could be fair. Two of those ultimately served on the jury.

■ Exposure to pretrial publicity is not inherently prejudicial, and a juror who can set aside an opinion previously formed may serve. *State v. Schneider,* 736 S.W.2d 392, 402 (Mo. banc 1987), *cert. denied,* 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988). Whether a venireperson is biased is often a question of demeanor for the trial judge. *Id.* at 403.

On the record here, trial counsel was not ineffective in handling publicity issues.

*First,* there is no merit to the claim that trial counsel should have sought additional voir dire. Control of voir dire is within the discretion of the trial judge; only abuse of discretion and likely injury justify reversal. *State v. Bannister,* 680 S.W.2d 141, 145 (Mo. banc 1984), *cert. denied,* 471 U.S. 1009, 105 S.Ct. 1879, 85 L.Ed.2d 170 (1985).

Contrary to Storey's assertion in his brief that "the only information about [venirepersons'] exposure to publicity came from Judge Dalton's one question," the trial judge extensively questioned those who knew about the case. The trial court complied with constitutional standards by retaining only those venirepersons who unequivocally stated that they had not prejudged the case and could be fair and impartial. *State v. Parker,* 886 S.W.2d 908, 919 (Mo. banc 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1827, 131 L.Ed.2d 748

(1995). This voir dire was no abuse of discretion, and trial counsel was not ineffective in choosing not to request more.

*Second,* counsel was not ineffective for opting not to seek change of venue. In *Schneider,* this Court upheld denial of a change-of-venue motion in a death-penalty case where less than half the venire had heard of the case; those who had were individually questioned; those who could not be fair were excused; and two jurors served who had heard of the case but could put aside any previous impression and evaluate the case fairly. *Schneider,* 736 S.W.2d at 403. Those facts are virtually identical to these facts. Point denied.

### III. Guilt Phase

#### A. Admission of Photographs

Storey argues that the trial court plainly erred in admitting photographs of the victim and crime site.

■ The trial court has broad discretion to admit or exclude photographs. *State v. Isa,* 850 S.W.2d 876, 890 (Mo. banc 1993). The gruesome nature of a photograph does not negate its admissibility where it serves a legitimate function, such as showing the nature and character of wounds, depicting the location and condition of the body, or establishing an element of the State's case. *Id.* at 890–91.

■ The photos here were admissible to show the nature and character of the wounds and to depict the location of the victim's body. Moreover, the type of wounds suffered and the appearance of the crime scene are relevant to deliberation, an element of first degree murder. *See § 565.020 RSMo 1986.* The trial court did not abuse discretion in admitting the photographs.

#### B. Acquittal on Murder Count

Storey contends the trial court plainly erred by not acquitting him of first degree murder, *sua sponte,* at the close of evidence because "the state adduced no evidence of deliberation."

■ A person commits first degree murder by "knowingly caus[ing] the death of another person after deliberation upon the matter." *§ 565.020 RSMo 1986.* Deliberation means "cool reflection for any length of time no matter how brief." *§ 565.002(3) RSMo 1986.* Deliberation may be inferred from the circumstances surrounding the murder. *State v. Feltrop,* 803 S.W.2d 1, 11 (Mo. banc), *cert. denied,* 501 U.S. 1262, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991). In reviewing a sufficiency-of-the-evidence claim, this Court determines if sufficient evidence permits a reasonable juror to find guilt. *State v. Grim,* 854 S.W.2d 403, 405–08 (Mo. banc 1993), *cert. denied,* — U.S. ——, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). The evidence and inferences are viewed in the light most favorable to the verdict. *Feltrop,* 803 S.W.2d at 11.

■ Storey admitted that he got a knife from the kitchen in his apartment, climbed up Frey's balcony, entered through her balcony door, and struggled with her. The victim died from two knife cuts of the throat; six ribs were broken, she had been stabbed in the side, and had been hit 12 times in the face and head. Many injuries preceded the fatal knife cuts. On this evidence, the jury could reasonably conclude that Storey coolly reflected before killing Frey. *See id.* at 11–12.

#### C. Tampering and Second–Degree Burglary Counts

Storey was convicted of tampering and second-degree burglary because he returned to Frey's apartment and "altered by cleaning up the scene of the crime physical evidence with the purpose to impair its availability in an official police investigation." Storey contends the trial court should have dismissed both counts because he reentered Frey's apartment before the police investigation started. He also contends trial counsel was ineffective for failing to move for dismissal and object to the instructions on tampering and burglary.

A person unlawfully tampers if he or she

[a]lters, destroys, suppresses or conceals any record, document or thing with purpose to impair its verity, legibility or avail-

ability in any official proceeding or investigation; ...

§ 575.100.1 RSMo 1986.

Storey wiped down Frey's apartment, cleaned under her fingernails, and collected and discarded evidence—all within the plain language of the statute. Nonetheless, Storey invokes *State v. Bulloch*, 826 S.W.2d 83, 85 (Mo.App.1992), arguing that tampering cannot occur until an "official proceeding or investigation" begins. Bulloch was charged with impairing an *official proceeding* and the court of appeals (invoking construction of "official proceeding" from a different statute) ruled that one cannot impair an official proceeding until it begins. *Id.*

 Storey, conversely, was charged with impairing an *investigation*. Bulloch says nothing about impairing an investigation, and the statute contains no requirement that an investigation begin before one can impair it. See § 575.100.1 RSMo 1986. Thus, the trial court properly permitted trial of the tampering and second-degree burglary counts. Since there was no reason to dismiss these counts, nor any basis to object to the instructions, counsel was not ineffective.

### D. Prior Conviction

 Storey pled guilty to burglary in Georgia in 1986. He now claims to be challenging that conviction as unconstitutional because he had no counsel. Storey contends that the trial court committed plain error by admitting a copy of the Georgia judgment, certifying Storey as a prior offender, and submitting Instruction 25 listing the Georgia conviction as a nonstatutory aggravating factor. Storey also argues that the motion court erred in denying a continuance or failing to leave the record open while he challenges the Georgia guilty plea.

Storey relies on *Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988). There, a Mississippi jury found a prior New York assault conviction to be an aggravating circumstance, and sentenced Johnson to death. *Id.* at 581 n. 1, 108 S.Ct. at 1984 n. 1. After the Mississippi murder trial, the New York Court of Appeals reversed the assault conviction. *Id.* at 582, 108

S.Ct. at 1984–85. The Mississippi Supreme Court refused Johnson's motion for post-conviction relief on the murder conviction. *Id.* at 582–83, 108 S.Ct. at 1984–85. The United States Supreme Court reversed, concluding that a death sentence based in part on a reversed conviction violates the Eighth Amendment. *Id.* at 585, 108 S.Ct. at 1986.

Unlike Johnson, Storey's prior conviction has not been reversed. In fact, the record shows no evidence that Storey even filed for post-conviction relief in Georgia. Until Storey secures a reversal, *Johnson* does not apply. *State v. Wise*, 879 S.W.2d 494, 520 (Mo. banc 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995). Thus, the trial court did not err—plainly or otherwise—in admitting the Georgia judgment, certifying Storey as a prior offender, or listing the conviction in Instruction 25.

Moreover, Storey's bare allegation that the Georgia guilty plea was without counsel does not justify a continuance or record extension. Storey's remedy is the same as Johnson's: obtain a reversal of the prior conviction, *then* challenge the death penalty by post-conviction proceeding. On this record, neither the trial court nor the motion court erred. Point denied.

### E. Voluntary Intoxication Instruction

Storey invokes *State v. Erwin*, 848 S.W.2d 476 (Mo. banc), *cert. denied*, —— U.S. ——, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993), claiming that Instruction 17 (based on MAI–CR3d 310.50) was unconstitutional.

In *Erwin*, this Court found MAI–CR3d 310.50 unconstitutional, but limited the holding to cases tried in the future and cases subject to direct appeal where the issue had been preserved. *Id.* at 484. Storey was tried before *Erwin* was decided, and concedes there was no trial objection nor any error alleged in the new trial motion. Thus, the claim was waived. *Rule 28.03.*

Storey also claims that trial counsel was ineffective for failing to preserve the issue, even though he was tried before *Erwin* was decided. This argument is again rejected. *See State v. Chambers*, 891 S.W.2d 93, 106 (Mo. banc 1994).

## F. Reasonable Doubt Instruction

The claim that Instruction 4 violates constitutional rights by diminishing the definition of "reasonable doubt" is again rejected. *See State v. Debler*, 856 S.W.2d 641, 652 (Mo. banc 1993).

## G. Guilt–Phase Prosecutorial Misconduct

### 1. Opening Statement

Storey asserts error in the prosecutor's references to Frey teaching handicapped children, her "serious" relationship with Dan Cruz, and the match of fingerprints in Frey's apartment with Storey's "inked prints" on file with the St. Charles Police Department.

■ Opening statement, previewing the evidence, may refer to admissible evidence. *See State v. Debler*, 856 S.W.2d 641, 656 (Mo. banc 1993). Frey's occupation was admissible because her co-workers discovered her body. Frey's relationship with Cruz was relevant because he was the last person to talk to her and tried to call repeatedly the day after the murder. The reference to inked prints was permissible because police solved the crime by comparing Storey's inked prints with a bloody palm print in Frey's apartment. The prosecutor could not describe this key point without referring to the inked prints on file. The opening statement did not indicate *why* the police department had Storey's prints on file, and thus, did not necessarily imply a previous arrest to the jury. Point denied.

### 2. Closing Argument

■ Storey argues that seven errors in the State's guilt-phase closing argument justify plain error reversal. A court should rarely grant relief on assertions of plain error at guilt-phase closing because, absent an objection, the trial court's options are limited to an invited interference with summation, which increases the risk of error. *State v. Clemmons*, 753 S.W.2d 901, 908 (Mo. banc), *cert. denied*, 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988).

*First*, Storey asserts error in the prosecutor's statement about finding Storey's palm print in Frey's apartment (despite his attempt to wipe prints away): "Was it luck or was it divine intervention?"

■ Storey invokes *State v. Debler*, 856 S.W.2d 641, 656 (Mo. banc 1993), where this Court cautioned both sides to avoid excessive Biblical references (but did not find plain error). Here, the prosecutor's reference to divine intervention was not excessive, and permissibly highlighted the police's good fortune that Storey missed the key palm print.

*Second*, Storey claims that references to his "inked prints" were improper. This argument was identical to that at guilt-phase opening (*see* section III.G.1. above), and was not improper.

■ *Third*, Storey claims error when the prosecutor said the police were professional, did everything necessary, and he was proud of them. Other than the statement of pride, the references were permissible inferences from the evidence. *Clemmons*, 753 S.W.2d at 908. The prosecutor's statement of pride in the police, while unduly personal and irrelevant, is not so improper and prejudicial as to be plain error. *See Debler*, 856 S.W.2d at 656.

■ *Fourth*, Storey claims error in the prosecutor emphasizing the implausibility of Storey's testimony by saying: "I'm just sorry that we don't have a sixth count of perjury." Storey argues this both inflamed the jury and injected evidence of uncharged crimes. Storey testified at guilt phase, putting his credibility into issue. *State v. Wren*, 643 S.W.2d 800, 802 (Mo. banc 1983). The prosecutor's reference to perjury was a rhetorical means of arguing that Storey's testimony was not believeable. While overdone and not condoned, the reference was not plain error. *See Clemmons*, 753 S.W.2d at 908 (calling defense witnesses "liars" not prejudicial where evidence supported challenge to credibility).

■ *Fifth*, Storey claims the prosecutor impermissibly personalized his argument by numerous uses of "I." Using "I" does not automatically inject personal beliefs into the argument. *Debler*, 856 S.W.2d at 656. Re-

view of the entire argument reveals no personalization rising to the level of plain error.

 *Sixth,* Storey claims the the prosecutor erred in arguing that, though no semen was found, Storey could still have sexual assault as a motive to enter Frey's apartment. Sexual assault does not require an emission. *See §§ 566.010, .040, .050 RSMo 1986.* The argument was legally accurate; permitting it was not plain error.

 *Seventh,* Storey claims error in the argument that "everyone in the courtroom" wanted a first-degree murder conviction. This rhetorical flourish was not plain error.

### H. Guilt–Phase Ineffective Assistance

#### 1. Sexual Assault Evidence

Storey alleges several errors by trial counsel regarding sexual assault evidence.

*First,* Storey assigns error because counsel neither objected to testimony that police prepared a rape kit, nor adequately cross-examined the witness who testified about it.

 Frey's body was found nude, except for a nightgown bunched up around her waist. In the State's case-in-chief, a police officer testified that a blood sample from Frey "was placed into the evidence rape kit." Storey claims trial counsel should have objected because the prosecutor said in voir dire "I don't, perhaps, see it [evidence of sexual assault] coming out at guilt phase." The prosecutor's statement at voir dire was equivocal, not a promise to omit sexual assault evidence at guilt phase. The brief reference to a rape kit was neither inflammatory nor prejudicial. Moreover, even if it were, trial counsel's decision not to object—and thus highlight the testimony—was a reasonable trial strategy and not ineffective assistance.

 Storey also argues that trial counsel was ineffective in cross-examining this same witness about details of the rape kit and the medical examination of Frey's body. At the 29.15 hearing, trial counsel testified this was a strategic decision because rape was already injected and "she wanted to take the sting out of it." Trial counsel knew that sexual assault would be an issue at penalty phase, and made the strategic decision to inform the jury of it at guilt phase "so it would not be so devastating in the penalty phase." The state of the victim's clothing injected rape as a possibility at both phases. Counsel's strategic choice to deal with it early was not unreasonable.

 *Second,* Storey attacks trial counsel's cross-examination of other witnesses who examined Frey's body. In fact, the challenged cross-examination elicited helpful testimony that Storey did not sexually assault Frey: (1) there was no semen or sperm, and (2) two pubic hairs found on Frey's body "did not have all the characteristics of Walter Storey's pubic hair sample." Storey tries to construct an ineffective-assistance claim because this cross-examination failed to "prove" he did not assault Frey. In fact, the cross-examination drew admissions that the evidence *could not* establish Storey as a rapist. Given the state of the victim's clothing, this cross-examination helped Storey, and was not legally ineffective.

 *Third,* Storey claims that trial counsel was ineffective in failing to interview (before trial) the witness who testified that the pubic hairs on Frey did not have all of Storey's characteristics. Storey fails to demonstrate prejudice because he does not show what an interview would have revealed. Moreover, as noted above, the cross-examination (without the interview) was effective.

#### 2. Invocation of Right to Counsel

Storey argues that trial counsel was ineffective for eliciting testimony that Storey invoked his right to counsel when questioned by police.

Storey admitted to police that he entered Frey's apartment with a knife, struggled with her, and stole money and her car, then returned the next day to wipe away his fingerprints and to discard evidence. These admissions were introduced in the State's case-in-chief. Later in guilt phase, Storey testified that he was abducted at knife point by a man resembling his uncle-in-law; that they knocked on Frey's door; that she voluntarily admitted them; that the other man

then threw Storey against a wall (dazing him); and that when Storey regained consciousness he saw the other man attacking Frey in her bedroom. Storey then testified that he returned to Frey's apartment the next day and removed fingerprints and other evidence, because he was afraid of being implicated, although he had done nothing wrong.

■ An obvious question about Storey's trial testimony is: Why didn't he tell the police about the man resembling his uncle-in-law? Counsel's decision to elicit early the answer—that the police interview was incomplete because Storey asked for a lawyer—was reasonable, especially since the defense had already told the jury that Storey would testify.

On this record, counsel made a reasonable strategic decision to inform the jury that the police interview was interrupted by Storey's invoking the right to counsel, because it was crucial that the jury know *why* Storey did not tell the police about the exculpatory evidence. Counsel testified at the 29.15 hearing that she recognized the possible prejudice, but made a "judgment call" that the benefits outweighed the prejudice. A strategic "judgment call" is not ineffective assistance.

■ Storey also argues that trial counsel should have objected when the prosecutor in cross-examination mentioned that Storey invoked his rights. The reference was brief, and Storey had opened the door. Thus, there was no prejudice.

### 3. Thomas Buel Testimony

At guilt phase, the defense called Thomas Buel, a State forensic analyst, who testified that Frey's throat wounds did not correlate with several knives found in Storey's apartment. On cross-examination, Buel testified that it is impossible to state that a certain knife did not make cuts to cartilage, and one knife from Storey's kitchen could have caused the wounds. Storey asserts that trial counsel was ineffective by not interviewing Buel before trial (relying only on his written report), and thus failing to discover weaknesses in his testimony.

■ This argument fails because it rests on the false assumption that Buel's testimony harmed Storey more than it helped. *See Appellant's Brief at 51* ("Buel's testimony became evidence for the State"). In fact, Buel's testimony, taken as a whole, was a logical effort to establish reasonable doubt that Storey killed Frey. On this record, reasonable trial counsel might call Buel even after interviewing him and discovering what the State elicited on cross-examination. Moreover, any harm to Storey from the cross-examination of Buel could not have changed the result.

### 4. Preparation

Storey argues that trial counsel inadequately prepared for guilt phase.

■ Storey first attacks the decision not to call Kimberly Henry, a store clerk who sold beer to someone—she could not remember whom, and could not identify Frey or Storey—at 11:17 p.m. on the night of the murder. The receipt for that sale was linked to Frey's apartment, and Storey contends Henry would have helped the guilt-phase defense that someone else killed Frey. Plainly, Henry's inability to remember who purchased the beer renders her testimony irrelevant, and preempts any prejudice.

■ Storey also contends that trial counsel should have tested the two pubic hairs found on Frey because testing might have shown they belonged to someone other than Storey. In fact, the trial testimony shows that two hairs are insufficient for conclusive determinations, and thus the evidence would not have changed the result.

### 5. Trial Counsel's Alleged Impairment

■ Storey asserts that trial counsel was impaired by alcohol use before and during trial. The record shows counsel drank beer and "had a buzz on" one evening while on an investigative trip, and had "a couple of drinks" one evening during the trial. On this record, the motion court's finding that counsel was not impaired is not clearly erroneous, and the claim borders on the frivolous.

### 6. "Lonnie Harnage" Offer of Proof

Storey finally contends that the motion court erred by denying his offer of testimony from a Georgia sheriff that Lonnie Harnage, Storey's father-in-law, had a reputation for violence and was left-handed. This testimony, Storey argues, supported the guilt-phase defense that someone other than Storey committed the murder, and thus should have been presented at trial.

This argument fails. Storey's testimony at trial was that *Tony* Harnage (or someone who looked like him) committed the murder. Thus, testimony about *Lonnie* Harnage could not have helped the guilt-phase defense. Moreover, the motion court correctly concluded that the sheriff's testimony was not admissible at trial because it merely cast suspicion on another person, with no supporting evidence. *See State v. Schaal*, 806 S.W.2d 659, 669 (Mo. banc 1991), *cert. denied*, 502 U.S. 1075, 112 S.Ct. 976, 117 L.Ed.2d 140 (1992). Choosing not to offer inadmissible testimony is not ineffective assistance. *Id.*

### IV. Constitutionality of Rule 29.15 Time Limits

Storey contends that the time limits in Rule 29.15 are unconstitutional. This argument is again rejected. *State v. Parker*, 886 S.W.2d 908, 929 (Mo. banc 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995).

### V. Penalty Phase

In his Rule 29.15 motion, Storey asserts that trial counsel was ineffective for failing to object to several improper arguments by the prosecutor throughout penalty-phase closing argument. To prove ineffective assistance, a defendant must show that counsel's performance did not conform to the degree of skill, care, and diligence of a reasonably competent attorney, and that the defendant was thereby prejudiced. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *State v. Wise*, 879 S.W.2d 494, 524 (Mo. banc 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995). To prove prejudice, a defendant must show a "reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *State v. Shurn*, 866 S.W.2d 447, 468 (Mo. banc 1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994). Trial strategy is not a ground for ineffective assistance. *Id.*

The motion court found that trial counsel was not ineffective, so review is to determine if the motion court clearly erred. *Rule 29.15(j)*; *Wise*, 879 S.W.2d at 524. Findings and conclusions are clearly erroneous if, after a review of the entire record, the appellate court is left with the definite impression that a mistake has been made. *Shurn*, 866 S.W.2d at 468–69.

The threshold issue is whether the prosecutor's penalty-phase arguments were errors, and therefore objectionable. Storey equates the argument here to that in *Newlon v. Armontrout*, 885 F.2d 1328 (8th Cir.1989), *cert. denied*, 497 U.S. 1038, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990). There, the Eighth Circuit granted habeas corpus because a penalty-phase closing argument violated both the Eighth Amendment and the Fourteenth Amendment Due Process Clause. *Id.* at 1337. After oral argument in this case, an Eighth Circuit panel granted habeas relief in *Antwine v. Delo*, 54 F.3d 1357, 1364 (8th Cir.1995), ruling that the penalty-phase closing violated the Eighth and Fourteenth Amendments. This Court is not bound to follow Circuit decisions but may consider them in undertaking its independent assessment of a case. *Wimberly v. Labor and Industrial Relations Commission*, 688 S.W.2d 344, 347–48 (Mo. banc 1985).

This Court finds four errors in the prosecutor's closing argument at penalty phase.

### 1. Arguing Facts Outside the Record

The prosecutor argued:

But, that's not what this case is about. This case is about the most brutal slaying in the history of this county.

A prosecutor may not argue facts outside the record. *State v. Shurn*, 866 S.W.2d at 460; *Rule 4.3.4* (a lawyer shall not ... assert personal knowledge of facts in

issue....). Assertions of fact not proven amount to unsworn testimony by the prosecutor. There was no evidence about the brutality of other murders in the county, and thus, the prosecutor's argument was improper.

A prosecutor arguing facts outside the record is highly prejudicial. A prosecutor's assertions of personal knowledge—here, that the prosecutor knew the details of all previous murders in the county since 1812—are "apt to carry much weight against the accused when they should carry none" because the jury is aware of the prosecutor's duty to serve justice, not just win the case. *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935); *see Rule 4.3.8.*

Several other times, the prosecutor injected personal opinions:

... sometimes I sit and think, I wonder if I'll ever accomplish as much as that woman did in her short lifetime.

. . . .

It's [the crime's] affected his family. I feel for them.

. . . .

I just want to say this to you: It is difficult to get out of an abusive relationship.

■ A prosecutor's statement of personal opinion or belief not drawn from the evidence is improper. *See State v. Jackson*, 499 S.W.2d 467, 471 (Mo.1973). The arguments here are irrelevant. The prosecutor's "wonder" about his accomplishments (compared to Frey's), his feelings about Storey's family, and his *opinion about getting out of an abusive relationship* have no bearing on the jury's sentencing decision. *See § RSMo 565.032 1986.*

■ Moreover, this form of argument essentially turns the prosecutor into an unsworn witness not subject to cross-examination. The error is compounded because the jury believes—properly—that the prosecutor has a duty to serve justice, not merely to win the case. *See Berger*, 295 U.S. at 88, 55 S.Ct. at 633; *Rule 4.3.8.*

■ This Court has often held that arguing facts outside the record is error warrant-

ing reversal. *See State v. Williams*, 646 S.W.2d 107, 109–10 (Mo. banc 1983); *State v. Holzwarth*, 520 S.W.2d 17, 21 (Mo. banc 1975); *State v. Mayfield*, 506 S.W.2d 363, 365 (Mo.1974); *State v. Swing*, 391 S.W.2d 262, 265 (Mo.1965); *State v. Baber*, 297 S.W.2d 439, 441 (Mo.1956).

### 2. Personalization to the Jury

The prosecutor argued:

Think for just this moment. Try to put yourselves in Jill Frey's place. Can you imagine? And, then—and then, to have your head yanked back by its hair and to feel the blade of that knife slicing through your flesh, severing your vocal cords, wanting to scream out in terror, but not being able to. Trying to breathe, but not being able to for the blood pouring down into your esophagus.

■ The prosecutor may not personalize argument to the jury. *State v. Raspberry*, 452 S.W.2d 169, 172 (Mo.1970). Personalization may taint the jury's judgment with suggestions of personal danger to them or their families. *Id.* Asking the jury to "put themselves in Jill Frey's place," then graphically detailing the crime as if the jurors were the victims, could only arouse fear in the jury. This argument was grossly improper.

■ The prejudice of this argument is undeniable. Inflammatory arguments that inflame and arouse fear in the jury are especially prejudicial when the death penalty is at issue. *State v. Tiedt*, 206 S.W.2d 524, 529 (Mo. banc 1947). "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 1205, 51 L.Ed.2d 393 (1977).

### 3. Killing Storey is Justified

The prosecutor argued:

I want you to think about that guy right there on the front row, Jeff Frey. What if he had happened onto this brutal thing and seen his very close sister in the process of

murdered? Would he have been justified in taking the Defendant's life? Yes. Without question. Without question.

 This argument is improper for several reasons. First, it argues facts outside the record; Jeff Frey did not, in fact, see the murder. Thus, it is error for the same reason as the "most brutal murder in the county's history" argument. *See State v. Williams,* 646 S.W.2d at 109–10; *State v. Holzwarth,* 520 S.W.2d at 21; *State v. Mayfield,* 506 S.W.2d at 365 (Mo.1974); *State v. Swing,* 391 S.W.2d at 265 (Mo.1965); *State v. Baber,* 297 S.W.2d at 441 (Mo.1956).

Second, the vivid image of a brother seeing his sister brutally murdered appears calculated only to inflame the jury; such arguments are errors. *See State v. Whitfield,* 837 S.W.2d 503, 513 (Mo. banc 1992).

Third, the argument equates the jury's sentencing function with self-defense, specifically referring to this crime. Such arguments are impermissible. *Cf. Shurn,* 866 S.W.2d at 465 (general reference to self-defense not mentioning this crime is permissible).

Finally, the hypothetical argument was irrelevant and induced the jury to apply emotion, not reason, to the death penalty sentencing decision. *See Gardner v. Florida,* 430 U.S. at 358, 97 S.Ct. at 1204–05.

### 4. Weighing Value of Lives

The prosecutor argued:

Why do we have the death penalty? The reason we have the death penalty is because the right of the innocent people to live outweighs—by huge leaps and bounds, outweighs the right of the guilty not to die. The right of the innocent completely outweighs the right of the guilty not to die, and, so, it comes down to one basic thing. Whose life is more important to you? Whose life has more value? The Defendant's or Jill Lynn Frey's?

 This argument seriously misstates the law. First, the prosecutor's attempt to simplify the death sentence to "one basic thing" is an error. Rather, the jury must consider a wide array of aggravating and mitigating circumstances. *§ 565.032 RSMo*

*1986.* Moreover, even if the process could be distilled to "one thing," it would not be "Whose life is more important to you? Whose life has more value?" In truth, "There is one principle ...: The State must ensure that the process is neutral and principled so as to guard against bias or caprice in the sentencing decision." *Tuilaepa v. California,* — U.S. ——, ——, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750 (1994).

 Second, the prosecutor's argument erroneously lumps all persons found guilty of murder into one category for penalty purposes. In fact, the sentencing process distinguishes some murderers from others; an aggravating circumstance that applies to all murderers is unconstitutional. *Arave v. Creech,* — U.S. ——, ——, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993). The sentencing decision must " 'rest on [an] individualized inquiry,' under which the 'character and record of the individual offender and the circumstances of the particular offense' are considered.' " *Romano v. Oklahoma,* — U.S. ——, ——, 114 S.Ct. 2004, 2009, 129 L.Ed.2d 1 (1994), *quoting McCleskey v. Kemp,* 481 U.S. 279, 303, 107 S.Ct. 1756, 1773, 95 L.Ed.2d 262 (1987).

### 5. Conclusion

 Having concluded that four aspects of the prosecutor's argument were erroneous, the question is: Was trial counsel ineffective for failing to object? This Court concludes trial counsel was ineffective.

The prosecutor's argument contained egregious errors, each compounding the other: arguing facts outside the record, personalizing the argument, and misstating the law. During the prosecutor's closing argument, trial counsel made only three objections, none to the objectionable portions of the argument quoted above. On this record, counsel's failure to object cannot be justified as trial strategy. A reasonably competent lawyer would have objected to the obviously improper arguments.

 Moreover, the failure to object was prejudicial. The errors were serious, and they occurred early in the argument, in both

opening and closing of the penalty-phase argument, and throughout the argument. There is a reasonable probability that these improper arguments affected the outcome of the penalty phase.

## VI.

This Court affirms the convictions, affirms the sentences except for the punishment of death which is reversed, reverses the denial of Rule 29.15 relief, and remands for proceedings consistent with this opinion.

COVINGTON, C.J., and HOLSTEIN, THOMAS, PRICE and LIMBAUGH, JJ., concur.

ROBERTSON, J., concurs in part and dissents in part in separate opinion filed.

ROBERTSON, Judge, concurring in part and dissenting in part.

I concur in the holding of the principal opinion affirming the jury's finding of the defendant's guilt and the sentences for the other crimes. I do not join the Court's decision reversing the sentence of death and remanding the case for new penalty phase proceedings.

First, I applaud the majority's refusal to exercise plain error review of closing argument in this case. "[P]lain error will seldom be found in unobjected closing argument." *State v. Kempker*, 824 S.W.2d 909, 911 (Mo. banc 1992). This is because "alleged errors committed in closing argument do not justify relief under the plain error rule unless they are determined to have a decisive effect on the jury." *State v. Sidebottom*, 753 S.W.2d 915, 920 (Mo. banc), *cert. denied*, 488 U.S. 975, 109 S.Ct. 515, 102 L.Ed.2d 550 (1988). Second, the Eighth Circuit's recent decision in *Antwine v. Delo*, 54 F.3d 1357 (1995), counsels against a state appellate court ever conducting plain error review except in the most egregious circumstances. " 'If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal court review that might otherwise be available.' " *Id.* at 1361 (*quoting Ylst v. Nunnemaker*, 501 U.S. 797, 801, 111 S.Ct. 2590, 2593, 115 L.Ed.2d 706 (1991)). I do not believe justice would be served by

plain error review of closing argument in this case.

Refusal to conduct plain error review does not end the discussion, however, as the majority's conclusion demonstrates. Rule 29.15 permits a convicted murderer to argue that his trial counsel failed to represent him effectively, claiming a violation of the Sixth Amendment's right to counsel and due process under the Fourteenth Amendment. Under Rule 29.15, post-conviction counsel is armed with carte blanche authority to second guess trial counsel's performance and search the record for, among other things, every instance that seems to support a claim that trial counsel's silence should have turned to an objection. Relief follows if the reviewing court makes two findings: First, that trial counsel's performance fell below an objective standard of reasonable competence and second, that counsel's ineffective performance created a reasonable probability that, but for trial counsel's ineffective performance, the jury *would* have (not *could* have) concluded that the convicted murderer deserved life in prison and not death. *Strickland v. Washington*, 466 U.S. 668, 687–88, 695, 700, 104 S.Ct. 2052, 2064–65, 2068–69, 2071, 80 L.Ed.2d 674 (1984).

Walter Timothy Storey—by his own words—entered Jill Frey's apartment through an unlocked patio door after climbing up her balcony, armed with a butcher knife he had taken from his mother's kitchen. He did not confess to killing Jill Frey, but the physical evidence revealed that she had six or seven broken ribs, that she had been struck in the face at least a dozen times and that she died as a result of two deep, six-inch gashes across her throat. She struggled. Storey had scratch wounds on his chest. Jill's body was found on the floor, her nightgown raised above her waist, foreign pubic hairs on her body.

On the basis of these *facts,* the jury found *beyond a reasonable doubt* that Storey murdered Jill Frey and did so in a manner that was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind." § 565.032.2(7), RSMo 1994.

The penalty phase of a death sentence case is unlike any other criminal proceeding in terms of both gravity and purpose. The members of the jury, as the representatives and symbols of society as a whole, must determine whether society would decide that a defendant's acts warrant the death sentence. The law erects channels to make sure that the deliberations of the jury are narrowed to assure that only persons whose crimes contain aggravating circumstances are eligible for the death sentence. Moreover, the jury's decision must be channelled to require " 'an *individualized* determination [of the appropriate penalty] on the basis of the character of the individual and the circumstances of the crime.' " *Tuilaepa v. California,* —— U.S. ——, ——, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750 (1994) (*quoting Zant v. Stephens,* 462 U.S. 862, 879, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983)) (emphasis original). Thus, even after the legal prerequisites for imposition of the death penalty are met, another purpose of the penalty phase is to make certain that the penalty fits this criminal. This is the "individualized determination" of which *Zant* speaks. This individualized determination requires the jury to consider fully the brutality of the murder involved and the state's interest in the death penalty it seeks. Throughout, "[t]he State must ensure that the process is neutral and principled so as to guard against bias or caprice in the sentencing decision." *Tuilaepa,* —— U.S. at ——, 114 S.Ct. at 2635.

In my view, the "state" to which *Tuilaepa* refers is not the state as a party in a criminal case, but the laws passed by the legislature, approved by the executive, and applied and interpreted by the judiciary. Once the "state" adopts procedures that narrow the eligibility for the death penalty and require the jury to hear evidence of mitigation, the process is neutral and principled and will guard against the bias and caprice the constitution condemns. Counsel in the case remain advocates for the positions they represent, subject to correction by the trial court on objection of opposing counsel if either strays outside the record. It is *not* the obligation of counsel for the plaintiff in the case—the state—to abandon the role of advocate in favor of a position of neutrality.

The jury could not impose the death penalty in this case unless the jury first found that Storey killed Jill Frey and that the murder was "outrageously or wantonly vile, horrible, or inhuman in that it involved torture, or depravity of mind." § 565.032.2(7), RSMo 1994. The law requires the state to prove that aggravating circumstance "beyond a reasonable doubt." § 565.032.1(2), RSMo 1994. Depravity of mind exists where the defendant's murder of the victim was brutal, involving "serious physical abuse." *State v. Griffin,* 756 S.W.2d 475, 490 (Mo. banc 1988), *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989). "For example, evidence that the murder victim ... [was] beaten or evidence that numerous wounds were inflicted upon [the] victim will support the aggravating circumstance." *Id.*

The Court finds Storey's counsel ineffective in failing to object to four portions of the state's closing argument during the penalty phase. I disagree. I do not believe Storey has met his burden under *Strickland* or under Rule 29.15. He offered no evidence at the Rule 29.15 hearing of prejudice other than a copy of the penalty phase transcript. Nor can the majority show where the prejudice is. Instead, the majority appears to create an irrebuttable presumption that prejudice exists whenever these words are said, no matter how heinous the crime nor how sure the evidence. Under *Strickland,* that prejudice is present only where there is a reasonable probability that the jury *would have* recommended (not could have recommended) a life sentence rather than death.

Under *Strickland,* or any other standard for that matter, I do not believe one can consider the closing argument in a vacuum in a search for outcome-determinative error. The closing argument is part of a total process that subjects the jury to presentations of evidence, the reading of instructions and the argument of counsel. At a minimum, a determination of prejudice requires that the closing argument be considered in the context of the entire penalty phase, not alone.

In this case, the brutality of the crime spoke for itself. I have a difficult time believing that a death sentence based on the

reality of at least a dozen blows to the face, six broken ribs, and *two* deep slashes across the throat could be rendered unconstitutional by the words the principal opinion condemns as so erroneous counsel provided ineffective assistance of counsel.

The state is entitled to argue that the brutality of the murder supports its submission to the jury. I do not believe the statement "[t]his case is *about* the most brutal slaying in the history of this county" [emphasis added] argues facts outside the record. The word "about" indicates approximation, not certainty. It invites the jury to consider the level of brutality of the murder. The other statements to which the majority refers are not so powerful as to sway the minds of the jurors and change their view of the appropriate penalty. I do not believe that jurors are so ignorant that they forget that the prosecutor is advocating a position or that they are so easily swayed by rhetoric that they abandoned their duty to weigh the evidence carefully in a manner consistent with the instruction, in reaching their sentencing recommendation. Trials begin with lengthy examinations of potential jurors to remove those who harbor prejudice or who will permit their emotions to overcome the court's instructions. I do not believe that winnowing process suddenly loses its effect once the jury enters the sentence-deliberating phase.

Second, the principal opinion relies on *State v. Raspberry,* 452 S.W.2d 169, 173 (Mo. 1970), for the proposition that personalization of the argument taints the jury's consideration of the evidence and appeals to their emotion. First, *Raspberry* condemns the argument when a jury is considering *guilt,* not punishment. On that basis alone, I do not think *Raspberry* applies. Second, it is virtually impossible for a person to consider the appropriate punishment for a murder this brutal without the mind reacting with some feeling. Emotion, as that word means "[t]he affective aspect of consciousness: FEELING," Webster's Third New International Dictionary, 742 (1976), necessarily plays a role in the deliberative process. "[C]hoice is either intelligence motivated by desire or desire operating through thought." Aristot-

le, *Nicomachean Ethics* 149 (1962). And, "decisions are made by emotions on an unconscious level, but they are validated with logic." L. Smith & L. Malandro, *Courtroom Communications Strategies* § 4.06 (1985).

In this case the jury was asked to consider whether Jill Frey's murder was outrageously or wantonly vile, horrible or inhuman, and involved torture or depravity of mind. This Court has defined that aggravating circumstance to permit the jury to consider the infliction of physical torture on the victim. *State v. Preston,* 673 S.W.2d 1, 10–11 (Mo. banc), *cert. denied,* 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984). Torture—to "subject to severe pain," Webster's Third New International Dictionary, 2414 (1976)— is a word that persons instinctively feel. So are vile, horrible, inhuman, brutal and physical abuse.

I see no outcome-determinative trespass in counsel's failure to object to a statement that invites the jury to consider the amount of pain and anguish Jill Frey suffered as it considered whether her death subjected her to severe pain, brutality or the severe physical abuse that, it seems to me, obviously accompanies six broken ribs, at least twelve blows to the face, and two throat slashings. The instructions the constitution demands channel the jury's consideration required such considerations. Judicial musings that a decision must not contain emotion deny what philosophers and scientists tell us makes for a good decisional process. The proper caveat would be that the decision not be based solely on emotion and that it be made in the presence of reason supplied by instructions.

Third, the prosecutor's statement that someone who happened on to the murder would have been justified in killing Storey to stop it is not about the presence of the victim's brother, but about the seriousness of the crime and a response to it that society recognizes as appropriate. I do not think the argument appeals to emotion to a degree that supports the result reached in the principal opinion, nor do I think the argument equates the jury's function with self-defense. The argument is, as the majority says, irrelevant. But irrelevance alone does not require a finding that counsel's failure to object cre-

ated a reasonable probability that the jury would have decided a different penalty if counsel had objected.

Finally, the argument styled "weighing the value of lives" seems to me little more than an inartful deterrence argument. I cannot find the infirmity the principal opinion finds and even if it exists, it is not prejudicial.

For these reasons, I do not believe that counsel's failure to object was outcome-determinative or that a reasonable probability exists that, but for the prosecutor's comments, the jury would have recommended life in prison without parole instead of death. That being the case, *Strickland* does not require reversal.

Having said all of that, the dilemma for me is whether to dissent or concur in the result the majority reaches. Death penalty jurisprudence in this country has responded more to judicial viscera than to constitutional principle. While the majority correctly asserts that we are not bound by the decisions of the Eighth Circuit, the judgments that we review ultimately find their way to that forum for an independent federal scrutiny. That federal scrutiny sometimes appears to harbor antipathy for the judgments of state courts in death cases. Worse, even decisions that I believe are profoundly incorrect—like *Antwine*—cast a corrupting shadow over our decisions if we choose to attempt to predict the outcome of federal review.

Yet that is what the principal opinion seems to do—to predict that federal habeas review of the death sentence in this case will result in a new penalty phase hearing. That prediction is exceedingly difficult and ultimately futile. The Eighth Circuit's recent *Antwine* standard is at loggerheads with *Blair v. Armontrout,* 916 F.2d 1310 (8th Cir.1990), *cert. denied,* 502 U.S. 825, 112 S.Ct. 89, 116 L.Ed.2d 62 (1991). Until that court adopts an en banc standard or the United States Supreme Court speaks, the composition of the judicial panel, not predictable standards, will determine the outcome.

Like the majority, if a rehearing is the ultimate result in this case, I would much prefer that this Court order it than countenance a delay of another seven or eight years.[1] However, I am willing to found my vote in this case on the belief that *Antwine* is an aberration. The majority guesses otherwise. Having decided to guess, it is difficult to fault the majority for guessing differently than I do.

I respectfully dissent from the majority's decision to reverse the death sentence in this case and remand for a new penalty phase hearing.

---

1. This Court decided *State v. Antwine,* 743 S.W.2d 51 (Mo. banc) in 1987. The Supreme Court of the United States considered Antwine's petition for certiorari and found no reason to review the case in 1988. *Antwine v. Missouri,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217. The Eighth Circuit set aside the death sentence and ordered a new penalty phase hearing for Antwine on May 12, 1995. *Antwine v. Delo, supra.*