Carman L. DECK, Appellant,

v.

STATE of Missouri, Respondent.

No. SC 91746.

Supreme Court of Missouri,
En Banc.

July 3, 2012.

Rehearing Denied Aug. 14, 2012.

Jeannie Willibey, Public Defender's Office, Kansas City, for Deck.

Evan J. Buchheim, Attorney General's Office, Jefferson City, for the State.

MARY R. RUSSELL, Judge.

This is the fifth action to come before this Court involving murders committed in 1996 by Carman Deck ("Movant"). Movant filed this Rule 29.15 post-conviction proceeding, asserting that his counsel at the penalty phase of his capital murder trial was ineffective for failing to call certain witnesses and for other alleged deficient performance. He also alleges that the motion court erred in denying his motion for a new trial. This Court finds no error and affirms the denial of Rule 29.15 relief and the denial of Movant's request for a new trial.

## I. Background

In February 1998, a jury found Movant guilty of two counts of first-degree murder, two counts of armed criminal action, one count of first-degree robbery, and one count of first-degree burglary for the 1996

robbery and shooting deaths of James and Zelma Long. He received two death sentences. This Court affirmed those convictions and sentences in *State v. Deck*, 994 S.W.2d 527 (Mo. banc 1999) (*"Deck I"*).[1] Movant filed a motion for post-conviction relief pursuant to Rule 29.15, which was overruled by the circuit court. On appeal, this Court reversed the death sentences but affirmed the findings of guilt for his convictions. *Deck v. State*, 68 S.W.3d 418 (Mo. banc 2002) (*"Deck II"*). At the penalty phase retrial, he was again sentenced to two death sentences. This Court affirmed the death sentences in *State v. Deck*, 136 S.W.3d 481 (Mo. banc 2004) (*"Deck III"*), but the United States Supreme Court granted certiorari and found Movant was denied a fair trial because he appeared in shackles in the presence of the jury during the penalty phase without a showing of circumstances that required shackling for the safety of those in the courtroom. *See Deck v. Missouri*, 544 U.S. 622, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005). This Court ordered a second penalty phase retrial, and Deck again received two death sentences. This Court affirmed the death sentences. *See State v. Deck*, 303 S.W.3d 527 (Mo. banc 2010) (*"Deck IV"*). Movant filed a Rule 29.15 motion for post-conviction relief on multiple grounds, claiming that his penalty phase counsel was ineffective for (1) failing to ask specific questions during voir dire, (2) failing to call additional mitigation witnesses, (3) failing to conduct neuropsychological testing on Movant, and (4) failing to object during the cross-examination of Movant's expert and during the prosecutor's closing arguments. The motion court denied Movant post-conviction relief on all points. He now appeals. Movant also asserts that

the motion court erred in denying him a new trial because the trial court improperly destroyed the jury questionnaires from his penalty phase hearing.[2]

## II. Standard of review for Rule 29.15

On appeal from the denial of post-conviction relief, the motion court's findings are presumed correct. *Zink v. State*, 278 S.W.3d 170, 175 (Mo. banc 2009). The motion court's judgment will be reversed if it clearly erred in its findings of fact or conclusions of law. *Id.;* Rule 29.15(k). A clear error is a ruling that leaves the appellate court with a definite and firm impression that a mistake has been made. *Id.*

## III. Ineffective assistance of counsel

To establish ineffective assistance of counsel meriting post-conviction relief, the movant must satisfy the two-prong test of *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the movant must show that counsel's performance was deficient by falling below an objective standard of reasonableness. *Id.* at 688, 104 S.Ct. 2052. If counsel's performance was deficient, the movant must then prove that he was prejudiced by counsel's deficiency. *Id.* at 687, 104 S.Ct. 2052. Prejudice, in the *Strickland* context, is defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.*

There is a strong presumption that counsel's conduct was reasonable and effective. *Id.* at 689, 104 S.Ct. 2052. To

---

1. A full recitation of facts underlying Movant's conviction is available in *Deck I*.

2. Because the death penalty was imposed, this Court has jurisdiction pursuant to article V, section 3 of the Missouri Constitution.

overcome this presumption, the movant must point to specific acts or omissions of counsel that, in light of all the circumstances, fell outside the wide range of effective assistance. *Id.* at 690, 104 S.Ct. 2052. Further, the choice of one reasonable trial strategy over another is not ineffective assistance. *Zink*, 278 S.W.3d at 176. Strategic choices made after a thorough investigation of the law and the facts are virtually unchallengeable. *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052.

### A. Penalty phase counsel was not ineffective during voir dire

Movant alleges that penalty phase counsel failed to adequately ask questions of the venire panel to expose potential bias. Specifically, Movant contends that counsel was ineffective for failing to ask the veniremembers "whether they could look at [Movant]'s childhood experience and give that meaningful consideration as a reason to vote against the death penalty."

 When imposing the death penalty, the sentencer must consider the character and record of the defendant and the circumstances of the particular offense. *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). To meet constitutional Eighth and Fourteenth amendment requirements, a death penalty statute cannot preclude consideration of relevant mitigating evidence. *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Further, a sentencer may not, as a matter of law, refuse to consider any relevant mitigating evidence. *Eddings v. Oklahoma*, 455 U.S. 104, 113–14, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).

 A juror in a death penalty case may not refuse to consider mitigating evidence outright. *Morgan v. Illinois*, 504 U.S. 719, 728–29, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). In *Morgan*, the Su-

preme Court held that the trial judge's refusal to allow defense counsel to ask the venire panel whether they would automatically vote for death if the defendant was convicted of first-degree murder violated the defendant's right to an impartial jury. *Id.* at 735–40, 112 S.Ct. 2222. A juror who would automatically impose the death penalty, the Court reasoned, is not an impartial juror, and the Fourteenth Amendment mandates such a juror be removed for cause. *Id.* at 728–29, 112 S.Ct. 2222. The Court held:

> A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.

*Id.* 729, 112 S.Ct. 2222. Jurors who would automatically vote to impose the death penalty "not only refuse to give such evidence any weight but are also plainly saying that mitigating evidence is not worth their consideration and that they will not consider it." *Id.* at 736, 112 S.Ct. 2222.

Movant argues that *Morgan* prohibits the empaneling of any juror who would not view childhood evidence as a reason to vote against the death penalty. Movant essentially contends that *Morgan* requires that counsel be permitted to ask the venire panel how certain mitigating evidence

would impact their deliberations and, further, that counsel was ineffective for failing to do so. Movant's contention is that failing to ask the venire panel during voir dire, "whether they could look at [Movant]'s childhood experience and give that meaningful consideration *as a reason to vote against the death penalty*" was a violation of Rule 29.15.

 Movant's proposed question is not essential to his effective assistance of counsel, as asking the potential jurors whether they would view Movant's childhood experience *as a reason to vote against the death penalty* is improper because it asks the potential jurors to commit to the weight they would give the evidence before they hear it. Although the jury is clearly required to consider mitigating evidence in deciding whether to impose the death penalty under *Lockett, Eddings,* and *Morgan,* the court and the parties may not inquire as to *how* such evidence will affect the potential jury's decision. Although a sentencer may not give mitigating evidence no weight by excluding such evidence from consideration, he or she may determine the weight to be given relevant mitigating evidence. *Eddings,* 455 U.S. at 114–115, 102 S.Ct. 869. Under these facts, counsel's performance was not deficient.

Although the questioning that Movant proposes is improper, exploration of juror biases regarding certain types of evidence is appropriate during voir dire. It is possible that a juror could be biased by the introduction of childhood evidence. The prosecution here adequately explored this possibility when it asked the following question to the venire panel:

And I guess the question I want to ask you is that you'll hear—I anticipate

you'll hear some evidence concerning [Movant]'s childhood, his upbringing.

. . .

Is there anybody here, that if you start hearing evidence about troubled childhoods, things like that, it's going to [a]ffect your ability to be fair in this case, one way or the other?

No venireperson indicated that such evidence would affect his or her ability to be fair in the case.

The prosecution's question adequately probed the potential jurors' bias without asking them to improperly commit to how certain evidence would affect their deliberations. The duty of counsel and the court in voir dire is to uncover biases of potential jurors to ensure an impartial jury. It is not the duty of counsel to ensure that biased jurors partial to their side are empaneled.

Because Movant failed to prove defense counsel's performance was deficient, Movant did not satisfy the first prong of *Strickland*'s ineffective assistance of counsel test. The motion court did not clearly err in denying Movant post-conviction relief on this issue.[3]

## B. Counsel was not ineffective by not calling additional mitigation witnesses

Movant argues that counsel was ineffective by failing to call the following mitigation witnesses: Michael Johnson, Carol and Arturo Misserocchi, Latisha Deck, Elvina Deck, Wilma Laird, Rita Deck, Stacey Tesreau–Bryant, and Tonia Cummings. He also contends that counsel was deficient for failing to present the deposition testimony of D.L. Hood and Pete Deck.

---

**3.** Because counsel's performance was not deficient, there is no need to address Movant's argument that the motion court's refusal to

permit him to interview the jurors prevented him from proving prejudice under the second prong of *Strickland.*

Movant argues that the additional mitigation witnesses would have provided "additional detail" about (1) the abuse and neglect suffered by Movant, (2) the care that Movant provided his younger siblings during their childhood, and (3) the bad character of Movant's caregivers during his childhood. Further, Movant argues that counsel was ineffective for choosing to present mitigating evidence through experts and prior deposition testimony rather than "live lay witnesses." Movant states that "live lay witnesses" would have conveyed to the jury that his life had value.

■■■■■ Counsel's decision not to call a witness is presumptively a matter of trial strategy and will not support a claim of ineffective assistance of counsel unless the defendant clearly establishes otherwise. *Hutchison v. State*, 150 S.W.3d 292, 304 (Mo. banc 2004). To prevail on a claim of ineffective assistance of counsel for failure to call a witness, a defendant must show that: (1) counsel knew or should have known of the existence of the witness; (2) the witness could be located through reasonable investigation; (3) the witness would testify; and (4) the witness's testimony would have produced a viable defense. *Id.; State v. Harris*, 870 S.W.2d 798, 817 (Mo. banc 1994).

Because Movant is challenging counsel's failure to call certain witnesses during the penalty phase, a "viable defense" is one in which there is a reasonable probability [4] that the additional mitigating evidence those witnesses would have provided would have outweighed the aggravating evidence presented by the prosecutor resulting in the jury voting against the death penalty. *See Storey v. State*, 175 S.W.3d 116, 138 (Mo. banc 2005) (stating that the introduction of additional mitigating evidence of the same nature as the evidence that was presented would not have outweighed the particularly disturbing photographs introduced as aggravating evidence).

## 1. The motion court did not clearly err in finding that counsel was not ineffective for not calling additional witnesses

### a. Testimony of mitigation witnesses presented to the jury

At the penalty phase hearing, counsel presented the live testimony of Dr. Wanda Draper, a child development expert, and Dr. Eleatha Surratt, a psychiatrist. Counsel also presented the videotaped depositions of Mike Deck (Movant's brother) and Mary Banks (Movant's aunt). Finally, counsel read aloud the depositions of Major Puckett (Movant's short-term foster parent) and Beverly Dulinsky (Movant's aunt). The jury heard the following testimony.

Movant's parents were unmarried when he was born. They had three other children, Tonia, Latisha, and Mike. Neither parent was willing to accept responsibility for Movant's poor upbringing.

As an infant, Movant suffered physical problems as the result of being kept in a home with no air conditioning in August. His parents had been feeding Movant powdered commodity milk instead of baby formula. Relatives purchased baby formula for Movant and would mix it up before they gave it to Movant's parents because his parents would use the canned cream in their coffee and cereal.

The experts detailed Movant's difficult childhood. When Movant was three months old, he was taken to the hospital

---

**4.** A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.

for dehydration and possible pneumonia because he did not have enough liquid or food. His mother had an explosive temper, and she would beat Movant often during his early years, leaving marks on him. Dr. Draper stated that Movant's mother was "quite abusive."

In addition to the physical abuse, Movant also did not have much emotional stability during his early years. Movant and his siblings were often left with relatives and babysitters while his parents went to nightclubs and bars. Movant's parents frequently brought their children to the bars, where they would sit in the bar, be left in the car, or be permitted to run free in the parking lot.

There were several times when the children were left at home alone. They did not know where their mother was, they were dressed "shabby," and there was no food in the house.

Movant's mother neglected the children because she was busy pursuing sexual relationships with various men. She would even have sex in her car in front of her children. Eventually, Movant's parents separated, and his mother moved in with her band member and boyfriend, D.L. Hood. Hood did not want anything to do with the children, so Movant's mother left the children with the Division of Family Services ("DFS").

During periods of extreme neglect, Movant took on the primary parenting role for his brothers and sisters. He was their major caregiver and the only person on whom they could count. Movant's brother testified that Movant "pretty much took care of [the Deck children]." He would steal food or go door-to-door to beg for food so that the Deck children would have something to eat. Movant's mother also taught Movant how to steal and encouraged him to do so. The children were also sexually abused.

From reading the depositions of Movant's brother and father, Dr. Draper related to the jury that one Thanksgiving, the sheriff's office discovered that Movant and his siblings had been left alone for a couple of days without food or supervision. While being fed Thanksgiving dinner by relatives, Movant's brother was so hungry that he ate his food too fast, causing him to vomit onto his plate. He was so desperately hungry that he tried to eat his own vomit off the plate.

When Movant was in fourth grade, Pete Deck, Movant's father, began living with a woman named Rita. Movant's father left Rita and married a woman named Marietta who was an alcoholic and did not want the children. Marietta would feed her own children a regular meal but would give the Deck children cold bologna and hot dogs without bread for dinner. Movant's brother stated that she would also "torture" the children by making them kneel on broomsticks "just because she didn't like us" and that "[s]he pretty much wanted my dad to herself."

Dr. Draper and Dr. Surratt also related to the jury one of Marietta's particularly disturbing abusive acts. When 11– or 12–year–old Movant was riding in the car with Marietta, he told her that he needed to go to the bathroom. Marietta told him to wait, but he could not, so he defecated in his pants. Marietta was so furious that she took off his clothes, took his own fecal matter, and smeared it on his face. She made him keep the fecal matter there so long that it began to dry. She also took a photograph of Movant with the feces smeared on his face and showed it to others. Movant's brother corroborated Marietta's actions. Mary Banks, Movant's aunt, stated that Movant's mother showed her the picture. She described the picture in her deposition. Eventually, Marietta

drove the Deck children to DFS and left them there. Movant was placed with a foster family, separated from his younger siblings.

Movant was initially placed with Carol and Arturo Misserocchi, but he did not stay with them very long. He did not make a connection with the Misserocchis. When Movant was about 13 years old, his aunt and uncle, Mary Banks and Norman Deck, sought to adopt him. His mother refused to allow the adoption unless they paid her the same sum she was receiving in government assistance. Because his aunt and uncle could not afford to do so, Movant was not adopted and he was again placed in foster care. From the time he was removed from the Misserocchis' home, he was placed in three different homes before he was placed in the care of Major and Linnie Puckett.

The Pucketts provided Movant with a regimented environment, and he thrived in that environment. The Pucketts would establish a routine for all of their foster children of homework and chores, and they would always have dinner together so that they could talk about whatever was on their minds. Movant had such a good relationship with Linnie Puckett that he began to call her "mom." About a year after Movant was placed with the Pucketts, however, Movant's mother showed up without warning and took him away. He begged her not to take him, saying that "if you take me away, you are killing me inside."

Movant's mother took him to live with her and Ron Wurst, her boyfriend at the time, who physically abused Movant's mother. About three months after he was removed from the Pucketts' home, Movant returned to their home asking to stay because his mother knocked him through a plate glass door. When Movant was 17, he dropped out of school and moved into his own living quarters. He asked his mother to move in with him to protect her from Wurst.

When Movant was 29 he became engaged to Stacey Tesreau–Bryant. She had a child with whom Movant had a good relationship.

Dr. Draper opined that all of Movant's childhood experiences made him the person he was at the time of the crime. Although "he was of normal intelligence" and "had potential," he had "no way to develop into a responsible, caring citizen." She also stated that she believed Movant suffered an "extreme case of a horrendous childhood" because he moved 22 times in 21 years, along with the abuse, neglect, and lack of guidance. Dr. Surratt opined that Movant's childhood was similar to one of the "most extreme cases of child abuse ever described."

Movant's brother testified that he and the rest of the Deck children were separated from Movant during their childhood. The rest of the Deck children went to live with Norman and Elvina Deck, but Movant continued to live with his mother. Movant's brother testified that if Movant had been afforded the same opportunities as himself, namely to live in a stable environment with Norman and Elvina for seven years, things might have turned out differently for Movant. Major Puckett also testified that if Movant had been allowed to stay with him, he believed that Movant would have been a "wonderful man."

Dr. Draper studied the depositions of Movant's parents, Movant's brother, Tonia Cummings, Mary Banks, Elvina and Norman Deck, Stacey Tesreau–Bryant and her son, Major Puckett, and the Misserochis.

Dr. Surratt interviewed Movant's parents, Movant's brother, Tonia Cummings, Latisha Deck, Mary Banks, Elvina Deck,

Rita Deck, Wilma Laird, Stacey Tesreau–Bryant, and Beverly Dulinsky. She also read the depositions of D.L. Hood, Major Puckett, and the Misserochis.

### b. The testimony of Michael Johnson, the Misserochis, and D.L. Hood was inconsequential

The motion court did not clearly err in finding that the testimony of the following four witnesses would have been inconsequential.

#### Michael Johnson

Michael Johnson was Marietta's son and Movant's stepbrother. He would have testified that Movant's grandfather did not like him and that he was verbally abusive. He also would have testified that the Deck children were "closed off."

#### Carol Misserocchi

Carol Misserocchi, Movant's short-term foster parent, would have testified that Movant was placed with her family for about six to eight months when he was 10 or 11 years old. She would have testified that Movant's family made no attempt to contact him, and that Movant showed very little emotion and that he did not bond with her. The other children at the Misserochis' did not like Movant, and he was "sassy."

#### Arturo Misserocchi

Arturo Misserocchi, Carol's husband, would have testified that he believed Movant's parents might have tried to call Movant when he lived at his and Carol's home. Movant also did not bond with Arturo, although he described Movant as "a cute little kid," with a "wonderful personality."

#### D.L. Hood

D.L. Hood, who is now deceased, was a former band-mate and boyfriend of Movant's mother. His previous deposition stated that Movant's mother was "crazy" and that she tried to stab Hood one night. He also stated that Movant's mother was promiscuous. Movant's mother also told him that she had taken the kids to the welfare office and left them on the steps.

█ Movant failed to show that, had the additional mitigating witnesses been called to testify, their testimony would have outweighed the aggravating evidence so that there was a reasonable probability the jury would have voted for life. The additional witnesses' testimony would not have produced a "viable defense." *Hutchison,* 150 S.W.3d at 304. Michael Johnson only added that Movant's grandfather was "verbally abusive." The Misserocchis had a brief interaction with Movant in the distant past. Hood only spoke to the interactions he had with Movant's mother and recounted the same stories the jury had heard from other witnesses about the mother's sexual promiscuity and neglect of her children. These witnesses' testimony was so lacking in substance that it would not have had an impact on the jury in their decision. The motion court did not clearly err in finding that these four witnesses' testimony would not have been compelling.

### c. The testimony of Latisha Deck, Elvina Deck, Wilma Laird, Rita Deck, and Pete Deck was cumulative

The motion court did not clearly err in finding that the testimony of the following five witnesses would have been cumulative to the evidence presented by counsel at the penalty phase.

### Latisha Deck [5]

Latisha Deck, Movant's mentally disabled sister, would have testified that Movant took care of her when she was little.

### Elvina Deck

Elvina Deck, Movant's aunt, would have testified that Movant's mother beat him. She also would have testified that his mother was very promiscuous—so much so that she even prostituted herself. She would have told her account of the incident in which the Deck children were brought to her home, dirty and starving, on Thanksgiving Day. She also would have provided her account of Marietta, Movant's stepmother, making the children kneel on broomsticks and her account of the "feces incident." She would have testified that Marietta encouraged Movant and his sister to steal for her. Elvina also would have testified that she still loved Movant very much. Counsel hired an investigator and made attempts to contact Elvina Deck to testify at the penalty phase, but she could not be found.

### Wilma Laird

Wilma Laird was Movant's aunt. She would have testified that she saw Movant's mother hit Movant in the temple with a flip-flop when he was one or two years old, although she downplayed the incident as "nothing drastic." She also would have testified that Movant's parents could be "good" parents. She stated that Movant's father tried to do the best he could for his children.

### Rita Deck

Rita Deck, Movant's stepmother, would have given her account of the Thanksgiving Day incident. She would have testified that when Movant's father left her, she continued to care for the Deck children because she did not know where Movant's mother was. Movant's aunt came for the children one day and gave them to Movant's father and his new wife, Marietta. Rita was upset that the children were in Movant's father's and Marietta's care because Rita "really cared for the kids."

Rita would have testified that Movant was "a good kid" and that he did not give her any trouble. She also would have testified that the four Deck children were very close.

Counsel subpoenaed Rita, but she was not cooperative and did not comply with her subpoena. Counsel stated that Rita did not want to be involved in the third retrial.

### Pete Deck

Pete Deck, Movant's father, would have testified that, after he left Movant's mother and the Deck children, he continued to take money to Movant's mother to provide for the children. He also would have testified regarding the incident in which the sheriff called him to pick up his children from Movant's mother's house on Thanksgiving Day because they had been left alone. He also would have testified to his former wife Marietta's poor treatment of the children, including the "feces incident." He would have testified that Marietta suggested foster care in front of Movant, and when Movant's father asked Movant how he felt about foster care, he stated that he would rather live in foster care than live with Marietta.

---

**5.** Movant also contends that the trial court abused its discretion in determining that Latisha Deck was not competent to testify due to her mental disabilities. This Court need not address whether the trial court abused its discretion because Latisha's testimony would have been cumulative.

When Movant's father was asked how many places Movant had lived from birth to age 16, he responded "four or five." He was surprised to hear that Movant had lived in more than 20 places in that time period.

Movant's father attended Movant's first trial, but Movant's counsel in the first penalty phase hearing did not call him to testify because he was in poor health and had high blood pressure. Movant's second post-conviction counsel subpoenaed Movant's father to testify at the penalty phase. At that time, he was living with Rita again, and she called counsel to report that he was too ill to testify. Counsel then received a doctor's note that stated testifying in court would be hazardous to his health. Counsel considered Rita and Movant's father to be uncooperative and had doubts about his medical condition. Rita and Movant's father did not comply with their subpoenas.

 The testimony that these five witnesses would have offered was repetitive to the mitigation testimony heard by the jury from the expert witnesses and previous depositions presented. Movant's argument that these five witnesses would have provided "additional detail" of his case in mitigation all but concedes that their testimony would have been cumulative. Counsel is not ineffective for not presenting cumulative evidence. *Skillicorn v. State*, 22 S.W.3d 678, 683 (Mo. banc 2000).

 Neither was counsel ineffective for failing to provide the jury with "live lay witnesses" rather than the experts' testimony that included the lay witnesses' statements. Significantly, the motion court noted:

> While Movant claims that the live testimony of these witnesses would bolster the believability of his claims of a diffi-

cult childhood, the [c]ourt has already indicated that the testimony was not compelling. Most of these witnesses were family members whose perceived motive to exaggerate was just as great as the experts, if not significantly greater.

Movant's contention that counsel was ineffective for failing to call live "lay witnesses" to provide "additional detail" of Movant's childhood is similar to the claims of the movant in *Storey*, 175 S.W.3d 116. In *Storey*, counsel presented the testimony of Storey's family members as well as a clinical forensic psychologist to show "all of the bad influences and discord that surrounded Storey's childhood." *Id.* at 123–24. His counsel also presented the testimony of an expert in the field of corrections and criminal justice to testify about Storey's nonviolent prison record. *Id.* at 123. In his motion for post-conviction relief, Storey claimed, *inter alia*, that his counsel was ineffective for failing to call additional mitigation witnesses. *Id.* at 137. Specifically, Storey claimed his counsel was ineffective for failing to call non-family witnesses to testify about his childhood because non-family evidence would have been inherently more credible than the family evidence presented by counsel. *Id.*

This Court held that Storey's counsel was not ineffective for failing to call additional non-family mitigation witnesses because additional witnesses would "reiterate the same stories already presented by witnesses who testified at trial." *Id.* at 138. Storey also argued that his counsel should have presented more family mitigation witnesses who would have provided additional details of his childhood and additional details of his good character. *Id.* This Court found that Storey's counsel had introduced this type of mitigation evidence through other family members, and that he failed to show that any of the additional wit-

nesses would have presented a viable defense. *Id.* at 137–38. "Counsel was not 'ineffective for not putting on cumulative evidence.' " *Id.* at 138 (quoting *Skillicorn,* 22 S.W.3d at 683).

The motion court here did not clearly err in finding that Movant was not prejudiced by counsel's strategic decision to tell the story of his childhood through experts rather than presenting a piecemeal picture of his childhood through uncooperative witnesses who had written Movant out of their lives (such as Movant's father and Rita Deck), through a witness who could not be located (Elvina Deck), or through a witness of questionable competence to testify (Latisha Deck). Additionally, Wilma Laird would have undermined counsel's strategy to highlight Movant's parents' horrible parenting by painting them in a favorable light.

Counsel's decision not to call cumulative "live lay witnesses" was an exercise of reasonable trial strategy. The motion court did not clearly err in finding that counsel was not ineffective for failing to call these five witnesses.

### d. Counsel made reasonable efforts to locate Stacey Tesreau–Bryant

■ Stacey Tesreau–Bryant, Movant's former fiancée, would have testified that she previously dated and lived with Movant for one year. At the time they dated, her son Dylan was approximately two years old. Movant helped take care of Dylan, and he treated him like a son. Dylan even called Movant "Daddy P." Movant continued to have a relationship with Dylan after Movant and Stacey's relationship ended. Movant told Stacey that his mom used to date a lot of men when he was young and that he had been molested by some of the men. She also would have testified that Movant shared with her that he was raped in prison.

Penalty phase counsel sent an investigator to Stacey's home. Stacey's husband at the time was hostile to the investigator and refused to provide Stacey's employer or work phone number. Counsel testified that given the husband's hostile nature and the tangential nature of Stacey's testimony, they decided to bring out Stacey's information through the experts.

Because Stacey has since separated from her husband, post-conviction counsel was able to locate her. Stacey testified that the only way for Movant's counsel to contact her would have been to ask her husband because she was disabled and unemployed, and her husband was always home. He was "totally against" Stacey's involvement in Movant's penalty phase hearing. Movant did not carry his burden to show that Stacey could have been located through reasonable investigation to testify at the penalty phase.

Additionally, much of Stacey's testimony was cumulative, and that Movant was raped in prison called attention to his adult criminal life rather than focusing on his traumatic childhood. Movant did not carry his burden to show that, had Stacey been located and testified at Movant's third penalty phase hearing, there was a reasonable probability the jury would have voted for life instead of imposing the death penalty.

### e. Counsel's decision not to call Tonia Cummings was reasonable trial strategy

■ Tonia Cummings, Movant's sister, was also his codefendant in the murders underlying this case. Tonia would have largely given the jury another account of the same testimony that they heard at trial. To that extent, Tonia's testimony would have been cumulative. However, Tonia did provide a few additional details.

She stated that Marietta would make the Deck children stay outside all day long and that she would make them use the bathroom outside as well. They were constantly thirsty and hungry in her care. She recounted a particular incident in which Movant found a big bag of dog food and fed it to the Deck children because they were so hungry. Marietta would also squirt dish soap in the children's mouths and make them swallow it. She also would have testified that Marietta was particularly hard on Movant, saying that "he's never going to amount to nothing, he's a piece of shit, we're bastards, our mother's a whore."

Tonia would have testified that when Movant was a teenager, their mother would fist-fight him. Movant also told Tonia that he was a "worthless piece of shit, that he's never going to amount to anything, that nobody ever loved him, all he wanted was for somebody to love him."

Although Tonia's testimony helped provide a complete picture of Movant's traumatic childhood, the decision not to call her as a witness at the penalty phase was undoubtedly reasonable trial strategy. Counsel did not want to put Movant's co-defendant on the stand because counsel did not want to allow the prosecution to cross-examine her about the murders. Also, counsel was concerned that Tonia may be viewed as an additional victim because she was in prison for the crimes that she committed with Movant. "Generally, the selection of witnesses and the introduction of evidence are questions of trial strategy and virtually unchallengeable." *Anderson v. State*, 196 S.W.3d 28, 37 (Mo. banc 2006); *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. . . ."). As counsel's decision not to call Tonia Cummings was one of reasonable trial strategy, counsel was not ineffective for deciding not to put her on the stand.

## C. Movant was not prejudiced by counsel's decision not to present a neuropsychologist's testimony

Movant claims that counsel was ineffective because they were aware that he had sustained multiple head injuries and was malnourished as a child, yet they did not request funding to conduct neuropsychological testing on Movant. Movant's hospital records reflected the following head injuries: a "laceration on his forehead" when Movant was 6 years old, a "possible concussion" when he was in a car accident at age 13, an incident where he hit his head on the bars in prison when he was 19 that caused him temporary blurred vision and a "spinning" head, and a laceration on his head in 1992. Movant also told counsel that he hit his head during a car accident and that he had been struck in the head with a baseball bat during a fight. Finally, there was evidence that Movant woke up one morning with a knot on his head, not able to remember the previous night.

Although Movant presents a list of injuries to his head, he does not present any evidence that his counsel was aware that those injuries caused brain damage. Further, he does not present any evidence, independent of his own post-conviction expert's testimony, that these injuries caused permanent damage at all. Because counsel did not have any reason to believe that Movant suffered from a neuropsychological impairment, counsel did not explore presenting that type of evidence in mitigation. Movant fails to prove that counsel was ineffective for failing to do so because he was not prejudiced by the decision.

In an attempt to prove prejudice, Movant presented the testimony of a neuropsychologist, Dr. Gelbort, at the post-con-

viction hearing. Dr. Gelbort's findings, however, did not suggest that Movant suffered from impaired mental functioning. The results of testing showed that Movant had an IQ score of 91, which is within the normal range. Movant admits that "Dr. Gelbort did not find significant or moderate impairment on any of the [IQ tests, and his] scores were grossly within the normal range." Dr. Gelbort also stated in his testimony, "And for what it's worth, and to be ... very upfront with it, I've not described significant or even moderate impairment on any of these [IQ] tests." Dr. Gelbort also described Movant as performing in the "borderline defective range" on the Category Test. Movant admits, however, that "[i]n and of itself, the borderline impairment score on the Category Test does not mean anything."

To support his contention that counsel was ineffective in deciding not to pursue evidence of impaired neuropsychological functioning, Movant relies on *Hutchison*'s statement that "evidence of impaired intellectual functioning is inherently mitigating...." 150 S.W.3d at 308. Dr. Gelbort admitted, however, that he did not find significant or even moderate impairment on any IQ tests.

Further, Movant's case is readily distinguishable from *Hutchison*. *Hutchison* involved a movant who displayed objective signs of impaired intellectual functioning that his counsel failed to investigate. Hutchison's records showed that he had been diagnosed with significant mental disabilities and had an IQ of 78. *Id.* at 306; *id.* at 309 (Limbaugh, J., dissenting). Further, Hutchison's counsel was woefully unprepared for the penalty phase because they failed to conduct an investigation into Hutchison's life history, troubled background, and mental and emotional deficits. *Id.* at 297. Counsel obtained a cursory report from a mental health expert that

identified some problems but failed to follow up on the issues uncovered in that report. *Id.* at 306. This Court held that counsel was ineffective for failing to conduct a thorough investigation and evaluation of these possible mitigators. *Id.* at 307–08.

In contrast, counsel in Movant's case conducted a thorough investigation into Movant's childhood, and there was no evidence of brain damage or impaired psychological functioning. Counsel made a decision not to pursue neuropsychological testing based on the facts they had gathered from their investigation. This Court, however, need not address whether this decision was one of reasonable trial strategy because Movant fails in his burden to show a reasonable probability that, had a neuropsychologist like Dr. Gelbort testified at his penalty phase hearing, the jury would have voted for life. Dr. Gelbort's testimony shows that Movant was not intellectually impaired, and his "borderline defective" score on the Category Test "did not mean anything" by itself. Movant was not prejudiced by counsel's decision not to conduct neuropsychological testing.

### D. Counsel was not ineffective for failing to object to the prosecutor's cross-examination of Dr. Surratt

During Movant's penalty phase hearing, the prosecutor and Dr. Surratt engaged in the following transaction on cross-examination:

**Prosecutor:** —Well I'm asking you—I didn't mean to cut you off—but I'm asking you about you being here today. Not prior work in this case, but being here today, you're here today to explain his behavior?

**Dr. Surratt:** Yes.

**Prosecutor:** And wouldn't it be easy or helpful to explain his behavior, if you had asked him why did you put a gun

against these people's head and kill them?

**Dr. Surratt:** And it could have, yes.

**Prosecutor:** It could have, but it also could have been pretty detrimental to Mr. Deck, if he said, the reason I killed them is *because I'm a no-good s.o.b. and wanted them dead,* because I didn't want to go to prison. That wouldn't be a very good answer for Mr. Deck, would it?

**Dr. Surratt:** It would have went along with my findings of how he responds to things; is it good or bad, not for me to say, but it certainly would have been fitting.

**Prosecutor:** He wanting these people dead just because he wanted their money fits along with what you believe?

**Counsel Tucci:** Objection; asked and answered.

**The Court:** Sustained; move on, please.

(Emphasis added).

Movant contends that the prosecutor's question to Dr. Surratt, including the statement that "it also could have been pretty detrimental to Mr. Deck, if he said, the reason I killed them is because I'm a no-good s.o.b. and wanted them dead," was improper name-calling and an ad hominem personal attack on Movant designed to inflame the passions of the jury. Movant argues that his counsel was ineffective for failing to object to the statement.

In support of this proposition, Movant cites *State v. Banks,* 215 S.W.3d 118 (Mo. banc 2007). In *Banks,* during rebuttal to the defense's closing argument, the prosecutor stated:

> And, ladies and gentlemen, when the scene is set and held[6] and we have to go and catch the Devil, there are no angels as witnesses. This is Hell. He is

the Devil. They aren't angels. He is guilty beyond a reasonable doubt.

*Id.* at 119.

The trial court permitted the prosecutor's argument over the defense's objection. *Id.* On appeal, this Court held that the trial court abused its discretion in overruling the defense's objection because the prosecutor's remark was "pure hyperbole, an ad hominem personal attack designed to inflame the jury." *Id.* at 121. Although *Banks* is instructive about what constitutes improper prosecutorial argument, it does not provide guidance as to when counsel's failure to object to such an argument would constitute ineffective assistance of counsel.

More on point, *State v. Storey,* 901 S.W.2d 886 (Mo. banc 1995), addresses when counsel is ineffective for failing to object. In *Storey* the prosecutor made multiple objectionable statements during opening and closing arguments. *Id.* at 900–02. The prosecutor argued facts outside the record by declaring that "[t]his case is about the most brutal slaying in the history of this county." *Id.* at 900. He also improperly personalized his argument to the jury:

> Think for just this moment. Try to put yourselves in [the victim]'s place. Can you imagine? And, then—and then, to have your head yanked back by its hair and to feel the blade of that knife slicing through your flesh, severing your vocal cords, wanting to scream out in terror, but not being able to. Trying to breathe, but not being able to for the blood pouring down into your esophagus.

*Id.* at 901. He also argued:

> I want you to think about that guy right there on the front row, [the victim's

---

6. It was noted in *Banks* that this was likely a transcription error and should have read "the scene is set in Hell." *Id.* at 119 n. 2.

brother]. What if he had happened onto this brutal thing and seen his very close sister in the process of murdered? Would he have been justified in taking the Defendant's life? Yes. Without question. Without question.

*Id.* at 901–02. The victim's brother did not see the murder, and suggesting that he did only served to inflame the jury. *Id.* at 902. The argument also improperly equated the jury's sentencing function with self-defense by asking if the victim's brother would have been justified in taking the defendant's life if he was, in fact, present during the victim's murder. *Id.*

Finally, the prosecutor improperly weighed the value of the defendant's life against the value of the victim's, stating:

Why do we have the death penalty? The reason we have the death penalty is because the right of the innocent people to live outweighs—by huge leaps and bounds, outweighs the right of the guilty not to die. The right of the innocent completely outweighs the right of the guilty not to die, and, so, it comes down to one basic thing. Whose life is more important to you? Whose life has more value? The Defendant's or [the victim]'s?

*Id.*

In spite of the fact that the prosecutor's arguments were obviously objectionable, Storey's counsel failed to object to any of them. *Id.* This Court held that "counsel's failure to object cannot be justified as trial strategy." *Id.* "A reasonably competent lawyer would have objected to the obviously improper arguments." *Id.* Further, this Court found that the counsel's failure to object was prejudicial and reversed Storey's death sentence. *Id.* at 902–03.

*Storey* was an extreme case of multiple inflammatory improper prosecutorial arguments that were presented at key junctures in the penalty phase hearing. Sto-

rey's counsel's failure to object under those circumstances clearly amounted to ineffective assistance of counsel. In this case, Movant's counsel did not fail their client as counsel in *Storey* did.

*State v. Tokar,* 918 S.W.2d 753 (Mo. banc 1996), is more analogous to Movant's counsel's performance in this case. In *Tokar,* the prosecutor stated that the "jurors might pray that their children will not have to experience what the [victim's] children went through with the murder of their father." *Id.* at 768. This Court reasoned that the movant correctly argued that the prosecutor's statement improperly personalized the argument and was error. *Id.* The prosecutor's error, however, did not justify reversal. *Id.* Applying *Strickland,* the movant was still required to prove that "trial counsel's failure to object did not conform to the degree of skill, care, and diligence of a reasonably competent attorney and that he was prejudiced." *Id.* This Court noted:

In many instances seasoned trial counsel do not object to otherwise improper questions or arguments for strategic purposes. It is feared that frequent objections irritate the jury and highlight the statements complained of, resulting in more harm than good.

*Id. Tokar* held that the movant failed to overcome the presumption that the failure to object was a strategic choice by competent counsel. *Id.* This Court also held that the movant failed to prove prejudice. *Id.* "The level of aggravating circumstances in this case overcomes any reasonable probability that the outcome of the sentencing phase would have been any different in the absence of this remark by the prosecutor when considered in the context of the trial as a whole." *Id.*

Finally, this Court noted:

[T]he alleged mistakes in this case do not equate to the "egregious errors, each compounding the other" that we found in *State v. Storey,* 901 S.W.2d 886, 902 (Mo. banc 1995). In that case, we reversed the defendant's sentence of death and remanded the cause for a new sentencing proceeding because defense counsel was ineffective in failing to object to the prosecutor's repeated argument of facts outside the record, personalization of the argument, and misstatement of the law. *Storey,* 901 S.W.2d at 902–03. The statements argued here simply do not compare.

*Id.* at 769.

Although the movant in *Tokar* failed to present any evidence during the post-conviction hearing regarding his counsel's failure to object to the prosecutor's improper argument, the testimony of Movant's counsel in this case only bolsters the conclusion that counsel's decision not to object was the exercise of reasonable trial strategy. *See id.* at 768.

Counsel Tucci could not specifically remember why he did not object to the prosecutor's statement, but he did state that he must have had a reason. Counsel Reynolds did not object because it was Tucci's witness, but he believed that Tucci may have not objected because he did not want to highlight the issue for the jury. He further noted that Tucci did object very quickly after the prosecutor's statement in question to "shut down" the prosecutor's argumentative line of questioning.

Although the hypothetical posed to Dr. Surratt in which Movant called himself a "no-good s.o.b." was improper on behalf of the prosecutor, counsel exercised reasonable trial strategy in not objecting to the statement. Counsel did not want to highlight the prosecutor's statement. Movant fails to overcome the presumption that counsel's failure to object was an exercise of reasonable trial strategy.

Further, Movant was not prejudiced by the prosecutor's statement when considering it within the context of the entire record. It was a brief statement that was subsequently "shut down" by counsel's objection. Just as in *Tokar,* "the alleged mistakes in this case do not equate to the 'egregious errors, each compounding the other' that we found in *State v. Storey.*" *Id.* at 769 (quoting *Storey,* 901 S.W.2d at 902). "The statements argued here simply do not compare." *Id.* The motion court did not clearly err in concluding that counsel's decision not to object was an exercise of reasonable trial strategy.

### E. Counsel was not ineffective for failing to object to the prosecutor's arguments about Movant's prior conviction for aiding escape

Movant was convicted of aiding an escape from prison in 1985. This evidence was introduced at trial in the form of Movant's sentence and judgment for the crime. No other evidence was admitted. During closing argument, the prosecutor told the jury: "You can consider all his prior escapes." The transcript also reads:

**Prosecutor:** While he's going to be in prison for the rest of his life if you let him live, remember, he knows how to escape. He aided and abetted others trying to.

**[Movant's Counsel]:** Objection; not a noticed aggravator.

**The Court:** Overruled.

**[Movant's Counsel]:** Irrelevant.

**The Court:** Overruled.

**Prosecutor:** He knows how to escape, helping people that were in for the rest of their lives.

Movant contends that his counsel was ineffective for failing to object to: (1) the prosecutor's use of the term "all his prior

escapes," when Movant was, in fact, only convicted once of aiding others in their escape; and (2) the prosecutor's statement that Movant helped individuals escape "that were in for the rest of their lives," when there was no evidence as to how long the individuals' sentences were.

On direct appeal, this Court reviewed these same prosecutorial statements for plain error and found that after reviewing the entire record, movant was not prejudiced by those statements. *Deck IV*, 303 S.W.3d at 542–43.

This Court's determination that no plain error prejudice resulted from the prosecutor's statements does not end the inquiry in this case, as the *Strickland* standard of prejudice is less exacting than the plain error standard. *Deck II*, 68 S.W.3d at 425–29. Plain error can serve as the basis for granting a new trial on direct appeal only if the error was outcome determinative. *Id.* at 427. In contrast, *Strickland* prejudice requires a *reasonable probability* that the result would have been different. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. However, "this theoretical difference in the two standards of review will seldom cause a court to grant post-conviction relief after it has denied relief on direct appeal. . . ." *Deck II*, 68 S.W.3d at 428. There are only a "small number of cases in which the application of the two tests will produce different results." *Id.* Movant's case is not one of those cases.

Looking at the prosecutor's misstatement in the context of the entire record, the failure of counsel to object to the prosecutor's simple misstatement in using the plural form did not prejudice Movant under the plain error standard or the *Strickland* standard. Further, in the

context of the entire record, the motion court did not clearly err in determining that the length of the sentences of the individuals whom Movant aided in escape was not "consequential or significant." Movant fails to prove that, but for counsel's failure to object to these prosecutorial misstatements, there was reasonable probability that the result of Movant's sentencing phase would have been different. The motion court did not clearly err in denying Movant relief on this point.

## IV. Movant is not entitled to a new trial based on the trial court's alleged destruction of the juror questionnaires

Movant argues that the motion court erred in denying his motion for a new trial because the trial court destroyed the juror questionnaires in violation of Court Operating Rule 4.21 and Rule 27.09(b). Movant contends that if he had been able to review the juror questionnaires of three particular jurors, he would have been able to determine whether their responses to the questions showed any bias against the defense. He contends that two of the jurors in question may have been biased because counsel noted juror Wheeler was "staring down [Movant]" and that Movant "does not like" juror Hayden. He also contends that the juror questionnaire may have provided more insight into why juror Holt knew a few Jefferson County bailiffs.[7]

Movant contends that, under the standard set forth in *In re R.R.M v. Juvenile Officer*, 226 S.W.3d 864, 866 (Mo.App. 2007), a defendant is entitled to a new trial if he exercised due diligence in attempting to obtain a complete record and is prejudiced by the incomplete nature of the rec-

---

7. Movant also stated that he wanted access to the juror questionnaires to obtain juror contact information so that he could contact the jurors. As discussed above, Movant was not entitled to contact the jurors. The failure to obtain contact information did not result in prejudice.

ord. It is not clear from the record whether the juror questionnaires were actually destroyed by the trial court, but the motion court's denial of Movant's request to review the juror questionnaires stated they had been destroyed.[8] Regardless of whether the questionnaires were destroyed by the trial court, copies of the juror questionnaires for the 12 jurors who served during the penalty phase trial have been filed with this Court and stipulated to by both parties. The questionnaires asked general questions about the juror's personal information, including name, address, employer, marital status, duration of residence in the county, persons living with the juror, and contact information. Additionally, each questionnaire asked the juror to check "yes" or "no" in response to the following questions:

3. Have you previously served as a juror anywhere?

. . . .

6. Have you or members of your immediate family ever suffered an accidental physical injury?

. . . .

7. Have you or members of your immediate family ever been a party to any lawsuit for damages?

. . . .

8. Has a CLAIM for personal injury ever been made against YOU?

. . . .

9. Have you ever made any CLAIM for personal injury?

. . . .

10. Are you related to or close friends with any law enforcement officer?

Movant fails to prove prejudice as required by *In re R.R.M.* Jurors Wheeler and Hayden provided no additional information on their juror questionnaires other than their basic personal information and the answers to the yes or no questions contained in the questionnaire. Nothing in their responses indicates they would be biased against the defense. Juror Holt's juror questionnaire also contained no information beyond the yes or no responses requested on the form. Movant was not prejudiced because the juror questionnaires did not provide evidence that any juror was biased against the defense. Movant was not entitled to a new trial.

### V. Conclusion

Movant has failed to prove that the motion court clearly erred in denying him post-conviction relief or erred in denying his request for a new trial. The judgment is affirmed.

All concur.

---

8. In Movant's motion below, his counsel explained:

> Counsel then called Division 2 and explained that she was trying to get a copy of the questionnaires, and she was forwarded to Pam with the Circuit Clerk's office. Counsel explained the specific circumstances of the case. Pam informed counsel that the questionnaires had been destroyed. As such, counsel had not been able to locate the questionnaires or obtain all of the jurors' correct addresses and information. On Thursday afternoon, August 26, counsel learned that the questionnaires are in the court file (a public defender investigator went to Division 2, and the clerk then discovered that the questionnaires were in the file but could not release them without the Judge's approval). Counsel had court out of town on Friday, August 27, and so will not be able to seek to obtain copies of the questionnaires, by motion, on or after the due date of this amended motion (August 30, 2010).

Then, on October 12, 2010, the motion court denied Movant's motion to review juror questionnaires because "the questionnaires have been destroyed."