

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

SHEILA A. WALLIS, )
)
Appellant, )
)
v. ) WD85887
)
STATE OF MISSOURI, ) Opinion filed: May 21, 2024
)
Respondent. )

**APPEAL FROM THE CIRCUIT COURT
OF JACKSON COUNTY, MISSOURI
THE HONORABLE JALILAH OTTO, JUDGE**

Division Three: Mark D. Pfeiffer, Presiding Judge,
Lisa White Hardwick, Judge and W. Douglas Thomson, Judge

Sheila Wallis appeals from the motion court's judgment denying her Rule 29.15 motion after an evidentiary hearing. On appeal, Wallis argues that the motion court erred because her trial counsel was ineffective for failing to investigate, obtain, and present her employment records either through a witness or a business records affidavit because those employment records would have provided her with a partial alibi and undermined the credibility of some of the State's witnesses. Finding no error, we affirm.

## FACTUAL AND PROCEDURAL HISTORY[1]

Wallis was convicted after a bench trial of two counts of aggravated stalking, two counts of stalking, and three misdemeanor counts of identity theft. Wallis was sentenced to six years' imprisonment for each aggravated stalking offense and four years' imprisonment for each stalking offense, with each sentence to run consecutively. She received six months' imprisonment for each misdemeanor offense with the sentences to run concurrently with all other sentences.

### Underlying Facts[2]

From May 2011 until January 2012, Wallis dated M.W. Wallis lived in Lenexa, Kansas and would go to M.W.'s home in Lee's Summit. The couple never exchanged "I love you," never met one another's families, and never attended one another's social work events. On January 14, 2012, Wallis went to M.W.'s home and was angry because Wallis had been sick and M.W. was not taking care of her. Wallis began hitting M.W. with a pillow and grew increasingly agitated when M.W. told her to stop. Wallis's tone of voice and the look in her eye caused M.W. to tell Wallis that their relationship was over and she needed to leave. Wallis refused to leave and M.W. called the police to have her removed from his home.

---

[1] "On appeal from the motion court's denial of a Rule 29.15 motion, we view the facts in the light most favorable to the underlying criminal conviction as those facts bear upon the motion court's judgment." *Morrison v. State*, 619 S.W.3d 605, 607 n.1 (Mo. App. W.D. 2021) (citing *McFadden v. State*, 553 S.W.3d 289, 296 n.2 (Mo. banc 2018)).

[2] We affirmed Wallis's conviction on direct appeal in a *per curiam* order, WD80817. *State v. Wallis*, 576 S.W.3d 186 (Mo. App. W.D. 2019). Many of the facts herein are taken from the memorandum in support of the *per curiam* order without further attribution.

For the next three years, Wallis engaged in a variety of disturbing and harassing behaviors towards M.W. and others in his life. These included leaving notes on M.W.'s car, leaving voice messages on M.W.'s telephone, showing up at M.W.'s home, sending mail to M.W., following M.W., and sending unsolicited items to M.W.'s home. Wallis persisted even after police reports were filed and even after M.W. changed addresses and telephone numbers.

After installing a security camera at his home in October of 2012, M.W. observed Wallis going through his trash at approximately 2:00 a.m. for three weekends in a row. On October 26, 2012, M.W. confronted Wallis at her car window, Wallis sped away, breaking M.W.'s arm. Even after this incident, M.W.'s security camera continued to pick up images of Wallis at M.W.'s home, and M.W. received text messages from Wallis about the cameras. One stated, "Your crappy cameras didn't stop me from coming over."

From May 2012 to June 2013, Wallis also targeted *M.W.'s new girlfriend* (Girlfriend I) by, among other things, leaving notes on Girlfriend I's car, sending unsolicited packages to Girlfriend I (such as a package of thong underwear), calling Girlfriend I, leaving screws behind Girlfriend I's tires, sending letters to Girlfriend I's son's middle school, texting Girlfriend I, following Girlfriend I, sending letters to Girlfriend I's place of employment, showing up at Girlfriend I's place of employment, and enrolling Girlfriend I on sexually explicit websites causing Girlfriend I to receive unsolicited calls from men and boys, with men twice showing up at Girlfriend I's residence.

From July 2014 to January 2015, Wallis similarly targeted *M.W.'s subsequent girlfriend* (Girlfriend II) by, among other things, leaving notes on Girlfriend II's front door or car that stated "Be careful" and "You should pay attention when people warn you," sending letters to Girlfriend II, sending cards (including a sympathy card) to Girlfriend II, showing up at Girlfriend II's residence, looking for Girlfriend II at Blue Springs High School, and enrolling Girlfriend II on sexually explicit websites.

From July 2012 to January 2014, Wallis targeted *M.W.'s daughter* (Daughter) by twice sending letters to Daughter at Daughter's mother's home, following Daughter home from a soccer game, sending Daughter a bracelet, and sending Daughter emails. Wallis also attended Daughter's sporting events on multiple occasions.

Detective S.T. (Detective) with the Kansas City Police Department (KCPD) investigated Wallis beginning August 2014. When Detective served Wallis with an ex parte order obtained by Girlfriend II, Wallis was very agitated. Shortly thereafter, Detective received a printout at KCPD that was a google map with M.W.'s address circled and "asshole" written by it, "daycare" circled at another spot, and "home" circled, forming a triangle. Attached to the printout was a sticky note that said, "Use some common sense." After receiving the note, Detective saw Wallis *near Detective's home*, and again when Detective was leaving a restaurant with her family.

Detective participated in executing a search warrant at Wallis's home where multiple documents relating to Wallis's victims (M.W., Girlfriend I, and Girlfriend II) were recovered. In Wallis's kitchen, police recovered a blue accordion file with documents relating to M.W., including credit checks, Daughter's sports schedule and school events, a picture of Daughter running cross country, M.W.'s credit card information, and mail from M.W.'s home. The file also contained information about Girlfriend I, including her employer and home address, her insurance card, tax records on her address and vehicles, and a packet from a detective agency dated July 9, 2012, with extensive information on Girlfriend I for which Wallis had paid. Similarly, the file contained information about Girlfriend II that included a sticky note with her name and social security number, credit report, and similar extensive documentation from the same detective agency.

Detective found a list of different email addresses relating to the victims; a list of "ways to get revenge or get back at somebody," which included things the victims had reported to police that Wallis had done; a second list of emails relating to the victims and their IP addresses; a form for an anonymous email address; a prepaid card with M.W.'s phone number that enabled Wallis to prank call him; a third document listing the victims' names, work addresses, emails, work and cell phone numbers; a list of email addresses that the victims received emails; a journal of where the victims were on certain dates and times; a list of how to get back at somebody or a "revenge list of what to do;" information pertaining to M.W.'s mother; and a garage sale posting with M.W.'s address. Investigators also

discovered spells, including Wiccan spells, love spells, and spells on how to get a lover back.

Detective also found a red folder on Wallis's coffee table with *personal information regarding Detective* inside. It included a printout with her name, home address, home phone number, and a google map of where she resided; Detective's personal tax records on what vehicles she owned; and a note stating, "I bet you don't like people threatening your family either, like your twin daughters." Detective was the only person involved with the investigation who had twin daughters.

Forensic examination of Wallis's computer revealed additional evidence of Wallis's targeting of the victims. For example, Wallis's computer included a diary from May 31, 2011 to July 16, 2014 that contained a detailed record of Wallis's activities. Many of the diary entries matched the victims' testimony about Wallis's acts. For example, on February 4, 2012, there was an entry stating, "Saturday 4:30 p.m. soccer game, left note on car." On July 5, 2012, Wallis wrote that she went through M.W.'s trash and got "lots of fireworks" in that she found tampons and a size medium package of women's underwear. On October 26, 2012, and entry stated, "broke arm," which coincided with M.W.'s testimony that Wallis broke M.W.'s arm when he confronted her outside of his home.

Wallis had letters she had sent or fliers she had posted saved to her computer. For example, Wallis had a Word document of a letter sent to M.W.'s employer stating M.W. was falsifying documents. (This same letter led to M.W.

being investigated by his employer). Wallis's diary also included documentation of phone calls she made to the victims, whether the victims answered, and the various phone numbers she used to make the calls.

Wallis had also downloaded a program onto her computer that allowed her to see when the victims were re-opening emails that she had sent them. Wallis's diary included entries about when she saw the victims, what the victims were wearing, what e-mail she had sent them, and when the e-mails were opened and re-opened by the victims.

Wallis also had a document titled "To Do 9-13-14.doc" saved to her computer, which was a general to-do list that corroborated similar entries in her diary. Another to-do list saved to Wallis's computer included a list of ways to harass M.W. specifically. These lists included writing a letter to herself, writing a letter to the Detective, cancelling a venue reservation for Girlfriend II's daughter's wedding, sending Girlfriend I "stalker stuff," and an entry to "send letter for child predator." A spreadsheet from Wallis's computer also included different websites for stalking and a to-do list with websites on revenge that included sending magazines, bills, and porn to the victims.

Wallis had also made documents reminding her to deactivate certain e-mail addresses and to send Detective a letter with the Detective's address, phone number, license plate, and KCPD IP address. One of Wallis's to-do lists included an item concerning one of the judges who had entered an order of protection

7

against her. Wallis's computer also had lists that included the victims' phone numbers, addresses, emails, family members, and employers.

Wallis had also saved several documents to her computer that included methods of stalking that Wallis was planning on, but had not yet, executed. Such items included:

- A form for reporting tax fraud with M.W.'s name;

- A termination of parental rights with M.W.'s name;

- A letter purportedly from the Missouri Sex Offender Registry addressed to M.W.;

- A letter notifying the recipient that Girlfriend II was fraudulently applying for bankruptcy;

**Procedural History**

A grand jury indicted Wallis on March 27, 2015 on two counts of aggravated stalking, two counts of stalking, and three counts of identity theft or attempted identity theft. Wallis filed a motion for a bill of particulars, which the trial court granted. The State filed a bill of particulars and thereafter filed an information in lieu of indictment. In the bill of particulars, the State gave notice that it intended to rely on at least two of the following acts as to Count I:

a. February 4, 2012 – note left on M.W.'s car
b. March 9, 2012 – phone call and voicemail to M.W.
c. March 18, 2012 – phone call and voicemail to M.W.
d. March 23, 2012 – defendant at M.W.'s property
e. March 28, 2012 – phone call and voicemail to M.W.
f. April 7, 2012 – items left at M.W.'s property
g. April 8, 2012 – phone call and voicemail to M.W.

8

h.      April 11, 2012 – phone call and voicemail to M.W.
i.      April 15, 2012 – defendant at M.W.'s property
j.      April 18, 2012 – defendant at M.W.'s property
k.      May 20, 2012 – defendant in M.W.'s neighborhood
l.      May 22, 2012 – email to M.W.
m.      May 26, 2012 – note left on M.W.'s car
n.      May 30, 2012 – M.W. received sonogram picture from defendant
o.      May 31, 2012 – email sent to M.W.
p.      July 5, 2012 – defendant at M.W.'s property
q.      September 8, 2012 – defendant at M.W.'s daughter's soccer game
r.      September 9, 2012 – defendant at M.W.'s daughter's soccer game
s.      September 30, 2012 – defendant followed M.W.
t.      October 12, 2012 – defendant at M.W.'s property
u.      October 19, 2012 – defendant at M.W.'s property
v.      October 26, 2012 – defendant at M.W.'s property
w.      October 31, 2012 – M.W. received mail from defendant
x.      November 21, 2012 – defendant at M.W.'s property
y.      Between November 22, 2012 and December 14, 2012 – M.W. received at least 31 text messages from defendant
z.      December 21, 2012 – M.W. received email from defendant
aa.      December 23, 2012 – M.W. received email from defendant
bb.      January 20, 2013 – defendant followed M.W.
cc.      March 16, 2013 – defendant followed M.W.
dd.      March 21, 2013 – defendant followed M.W.
ee.      March 28, 2013 – defendant followed M.W.
ff.      June 2, 2013 – pizza delivered to M.W. at his residence
gg.      June 2, 2013 – defendant at M.W.'s property
hh.      August 1, 2014 – defendant at M.W.'s property
ii.      August 14, 2014 – M.W. received email from defendant
jj.      December 15, 2014 – M.W. received anonymous email sent from defendant
kk.      December 19, 2014 – M.W. received anonymous email sent from defendant
ll.      December 22, 2014 – M.W. received card from defendant
mm.      December 27, 2014 – M.W. received three anonymous email[s] sent from defendant
nn.      December 27, 2014 – M.W. received email card from defendant
oo.      December 28, 2014 – M.W. received anonymous email sent from defendant
pp.      January 1, 2015 – defendant at M.W.'s property
qq.      January 3, 2015 – M.W. received anonymous email sent from defendant
rr.      January 10, 2015 – defendant at M.W.'s property

ss.     January 13, 2015 – defendant followed M.W.
tt.     January 15, 2015 – defendant at M.W.'s property
uu.     Between December [2014] and February 2015 – M.W. signed up to received numerous travel brochures

Similarly, in Count II, the State gave notice of the following acts that it intended to rely on:

a.     July 9, 2014 – note left on [Girlfriend II's] front door
b.     July 15, 2014 – letter from defendant received by [Girlfriend II]
c.     July 29, 2014 – defendant at [Girlfriend II's] residence
d.     July 29, 2014 – letter sent from defendant to [Girlfriend II]
e.     August 7, 2014 – letter at [Girlfriend II's] house from defendant
f.     August 8, 2014 – letter sent from defendant to [Girlfriend II]
g.     August 12, 2014 – defendant at [Girlfriend II's] residence
h.     September 12, 2014 – defendant looked for [Girlfriend II] at Blue Springs High School
i.     September 13, 2014 – defendant at [Girlfriend II's] residence
j.     September 2014 – [Girlfriend II] enrolled on sexually explicit website
k.     December 2014 – [Girlfriend II] received birthday card from defendant
l.     January 10, 2015 – defendant at M.W.'s residence while [Girlfriend II] also at M.W.'s residence
m.     January 15, 2015 – defendant near M.W.'s residence while [Girlfriend II] also at M.W.'s residence
n.     January 19, 2015 – Girlfriend II received sympathy card from defendant

Wallis waived her right to a jury trial.   The trial court conducted a four-day bench trial, at which the State presented the testimony of each of the victims and various other witnesses.   After the bench trial, Wallis was found guilty of two counts of aggravated stalking, two counts of stalking, and three misdemeanor counts of identity theft.

**Post-Conviction Proceedings**

10

Wallis filed an amended motion for post-conviction relief that raised several claims of ineffective assistance of her trial counsel. The motion court held an evidentiary hearing on that motion on October 29, 2021. At that hearing, Wallis waived all of her post-conviction claims other than claim 8(d). Claim 8(d) argues that Trial Counsel was ineffective in failing to investigate and present Wallis's employment records at trial to demonstrate that Wallis worked on dates when she also stalked the victims. Wallis argued that her employment records would have either undermined the victims' credibility or provided her with an alibi. Wallis's counsel at the post-conviction hearing stated that Claim 8(d) concerns Counts I and II and not the remaining counts.

Trial Counsel testified at the evidentiary hearing. Trial Counsel stated that his strategy at trial was "that there was an intervening cause that extinguished the legal liability of [Wallis] as it relates to the stalking counts." Namely, Trial Counsel's strategy at trial was to present evidence that M.W. "engaged in sort of this back-and-forth with" Wallis. Trial Counsel testified that to prepare for trial, he reviewed all of the State's evidence, which included over 1,500 pages of documents, surveillance video, photos, text messages, emails, letters, notes, and Wallis's diary, and conducted depositions or interviews of the victims, witnesses, and the forensic examiner who reviewed Wallis's computer.

Trial Counsel also testified that he attempted to obtain Wallis's employment records. Trial Counsel stated that he tried to obtain those records, "[b]ecause we had a bill of particulars setting forth specific dates on which offenses were – or

conduct was alleged to have occurred. Which may have provided some sort of alibi for [Wallis] as to those allegations." Trial Counsel acknowledged that if Wallis's employment records had shown that she was at work on some of the days when the victims claimed she was stalking them, he could have used those records to undermine the victims' credibility. Trial Counsel also acknowledged that the State's evidence included only dates and not times that Wallis committed certain acts. Trial Counsel testified that other evidence – like surveillance video and witness testimony – corroborated acts that the State alleged Wallis committed.

The motion court issued Findings of Fact and Conclusions of Law. The motion court determined that:

> [T]rial counsel did attempt to obtain the records from [Wallis's] employer, however said records were not presented at trial. The Court further finds that trial counsel knew or should have known of a witness at Children's Mercy Hospital; that the witness could be located through reasonable investigation; and that the witness would have testified about [Wallis's] employment records if subpoenaed to testify at trial, or the records could have been admitted with an appropriate business records affidavit. The only questions that remains [sic] are whether the witness' testimony, or the employment records[,] would have helped [Wallis]; assisted [Wallis] in producing a viable defense; and reasonably produced a different outcome.

The motion court reviewed Wallis's employment records and determined that she "would have been employed for 22 of the specific dates listed in the Bill of Particulars." The motion court found,

> [A]fter accounting for days that [Wallis] was either fully or partially off work and excluding conduct that would not require [Wallis's] physical presence, only eight (8) work days overlap with the 60 dates outlined in the Bill of Particulars. Three (3) days related to Count One: August 1, 2014, January 13, 2015, and January 15, 2015; and five (5) days related to Count Two: July

12

9, 2014, July 15, 2014, July 29, 2014, August 12, 2014, and September 12, 2014.

The motion court determined that Wallis's employment records show she clocked in from 7:53 a.m. to 4:35 p.m. on August 1, 2014. At trial, M.W. testified seeing Wallis at his property on August 1, 2014 but did not testify as to the time of day this encounter occurred. The motion court noted that the State did not present any evidence relating to January 13 or January 15, 2015 at trial.

As to Count II, the motion court noted that Wallis's employment records indicate that she worked on five of the dates: July 9, 2014, July 15, 2014, July 29, 2014, August 12, 2014, and September 12, 2014. On July 9, 2014, Wallis's employment records list that she worked from 7:19 a.m. to 4:30 p.m. At trial, Girlfriend II testified that on July 9, 2014, Wallis left a note on her door. Wallis's diary included an entry on July 9, 2014, that read "no cars there again, must still be out of town."

Wallis's employment records indicate that she worked from 7:31 a.m. to 4:00 p.m. on July 15, 2014. At trial, Girlfriend II testified that on July 15, 2014, Wallis left a letter on her door. The State also introduced an entry from Wallis's diary from that date, which stated, "6:52am saw her leave for work, I left letter, think he's out of town."

Wallis's employment records show she worked from 7:49 a.m. to 5:30 p.m. on July 29, 2014. At trial, Girlfriend II testified that she saw Wallis take a photo of

13

her near Girlfriend II's house, but did not testify about what time this encounter occurred.

Similarly, Wallis worked from 7:59 a.m. until 4:30 p.m. on August 12, 2014. Girlfriend II testified that she saw Wallis near her house on that date and took a picture of Wallis in her vehicle. The State also introduced the diary entry Wallis made on that date: "she followed me from her house to 152, she then turned around and took 435 home, did not stop at his place on way home, he might have been out of town."

On September 12, 2014, Wallis's employment records show that she worked from 7:59 a.m. until 4:30 p.m. The State presented evidence at trial that on that date, Wallis made the following diary entry:

> no cars in front of the house from 5:45 to 7, his truck was in the driveway at 9:30pm; she was not home at 9:45pm or 8:15pm, couldn't find either car in parking lot at football game at Blue Springs High School, think he picked [Daughter] up before game was over and she may have had dinner or done something with him before that.

The motion court also highlighted that Wallis's employment records include additional evidence of her guilt. Wallis's employment records include termination documentation that contain excerpts from a diary and a to-do list saved to her work computer that were similar to the diary and to-do list recovered from Wallis's home computer and introduced at trial.

In sum, the motion court denied Wallis relief, finding that the State's evidence did not conflict with Wallis's employment records. The motion court highlighted that the State's evidence from some of the days where Wallis was

14

working included Wallis's own diary entries that documented her stalking activities. Ultimately, the motion court concluded that Wallis's employment records would not have changed the outcome at trial. This appeal follows.

## STANDARD OF REVIEW

Our review of the denial of a Rule 29.15 motion is "limited to a determination of whether the findings and conclusions of the [motion] court are clearly erroneous." Rule 29.15(k). "Such findings and conclusions are considered clearly erroneous only if a full review of the record leaves us with 'a definite and firm impression that a mistake has been made.'" *Laub v. State*, 481 S.W.3d 579, 582 (Mo. App. S.D. 2015) (quoting *Zink v. State*, 278 S.W.3d 170, 175 (Mo. banc 2009)). "The motion court's findings are presumptively correct." *Walker v. State*, 626 S.W.3d 331, 333 (Mo. App. E.D. 2021) (citing *Davis v. State*, 486 S.W.3d 898, 905 (Mo. banc 2016)). "'Even if the stated reason for a motion court's ruling is incorrect, this Court will affirm the judgment if it is sustainable on other grounds.'" *Webber v. State*, 628 S.W.3d 766, 770 (Mo. App. W.D. 2021) (quoting *Dorsey v. State*, 448 S.W.3d 276, 282 (Mo. banc 2014)). "It is incumbent upon the movant in a post-conviction motion to prove his or her claims for relief by a preponderance of the evidence[.]" *Laub*, 481 S.W.3d at 582 (citing Rule 29.15(i)).

## ANALYSIS

Wallis brings one point on appeal. She argues that the motion court erred in denying her Rule 29.15 motion because her trial counsel was ineffective by failing to investigate, obtain, and present her employment records at trial. Wallis

contends that her employment records would have cast doubt on the victim's credibility as to when she was stalking them and provide her an alibi.

Wallis must meet the following burden to support her claim that Trial Counsel provided her with ineffective assistance:

> In order to prevail on a post-conviction motion alleging ineffective assistance of counsel, a movant must overcome a strong presumption of competence and demonstrate, by a preponderance of the evidence, that (1) counsel did not exercise the customary skill and diligence that a reasonably competent attorney would have exercised under the same or similar circumstances, and (2) counsel's failure to exercise such skill and diligence prejudiced the movant in some way. *Strickland v. Washington*, 466 U.S. 668, 687, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Anderson v. State*, 196 S.W.3d 28, 33 (Mo. banc 2006). To satisfy the performance prong, a movant "must overcome the presumptions that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment." *State v. Simmons*, 955 S.W.2d 729, 746 (Mo. banc 1997). In order to demonstrate the requisite prejudice, a movant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. *Strickland* defines "a reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* In reviewing such claims, we are not required to examine both prongs; if a movant fails to satisfy the performance prong, we need not consider the prejudice prong, and vice versa. *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052; *State v. Sanders*, 738 S.W.2d 856, 857 (Mo. banc 1987).

*Laub*, 481 S.W.3d at 582-83.

We presume that "counsel acted professionally in making decisions and that any challenged action was a part of counsel's sound trial strategy." *Skillicorn v. State*, 22 S.W.3d 678, 681-82 (Mo. banc 2000). "'The question in an ineffective assistance claim is not whether counsel could have or even, perhaps, should have made a different decision, but rather whether the decision made was reasonable

16

under all the circumstances.'" *Johnson v. State*, 406 S.W.3d 892, 901 (Mo. banc 2013) (quoting *Henderson v. State*, 111 S.W.3d 537, 540 (Mo. App. W.D. 2003)). "Generally, the selection of witnesses and the introduction of evidence are questions of trial strategy and virtually unchallengeable." *State v. Kenley*, 952 S.W.2d 250, 266 (Mo. banc 1997).

"'To prevail on a claim of ineffective assistance of counsel for failure to investigate, a movant is required to allege what information [trial] counsel failed to discover, that a reasonable investigation would have resulted in the discovery of such information, and the information would have aided and improved the defense.'" *Prince v. State*, 390 S.W.3d 225, 233 (Mo. App. W.D. 2013) (quoting *Bliss v. State*, 367 S.W.3d 190, 195 (Mo. App. S.D. 2012)).

Similarly, to prevail on a claim of ineffective assistance for failure to call a witness, Wallis must demonstrate that: "(1) counsel knew or should have known of the existence of the witness; (2) the witness could be located through reasonable investigation; (3) the witness would testify; and (4) the witness's testimony would have produced a viable defense." *Deck v. State*, 381 S.W.3d 339, 346 (Mo. banc 2012).

Here, to prevail on her claim, Wallis must demonstrate by a preponderance of the evidence that her employment records would have aided or improved her defense. The motion court determined that Trial Counsel attempted to obtain and investigate Wallis's employment records, and, after reviewing all of the State's evidence, decided to proceed with a legal defense and not with the aid of such

records. The motion court also found that Trial Counsel had a strategic reason for not using Wallis's employment records at trial because they would not have aided in her defense.

We find that Wallis cannot meet her burden and the motion court did not err in finding Wallis received effective assistance of counsel. Overall, Trial Counsel (or his predecessors) requested a bill of particulars, obtained and reviewed the State's evidence, and attempted to obtain her employment records. The motion court rightly pointed out that Trial Counsel could have obtained Wallis's employment records or identified a custodian witness to testify about Wallis's employment records through a reasonable investigation.

However, even if Trial Counsel had obtained Wallis' employment records or called a custodian witness to testify to her them, those records would not have aided her defense. The evidence in this case against Wallis is extensive. Importantly, even on dates when Wallis's employment records showed she worked, Wallis's *own diary* documents that she indeed engaged in various stalking behaviors. The State's evidence included documents, videos, photographs, text messages, emails, letters, notes, and witness testimony about Wallis's various stalking activities. Much of the State's evidence was corroborated by Wallis's own diary and other information found in Wallis's home and personal computer.

In fact, as the motion court rightly points out, none of Wallis's employment records undermines any witness testimony or offers her an alibi. As we stated above, the motion court carefully reviewed Wallis's employment records and

18

compared those records with the testimony and other evidence at trial to determine that those employment records would not have aided her defense. At best, Wallis's employment records show that she was working at certain times on certain days and that, perhaps, she could not have been physically stalking the victims during *those* times. These records simply evidence that Wallis worked eight of the sixty dates in question, a mere thirteen percent, yet *still* leaves time even on *those* days for Wallis to have committed the alleged actions. Such evidence merely narrows, and does not eliminate, the windows of opportunity Wallis had to stalk the victims on days when she worked, and notably does nothing to assist her on the overwhelming number of other dates in question. Wallis's employment records do not undermine any testimony from any of the victims about when Wallis followed or otherwise harassed them.

Instead, Wallis's employment records demonstrate that – even at work – Wallis was dedicated to stalking the victims. Wallis's termination documentation indicates that she was terminated after her employer found that "Wallis had saved a series of Word documents of a personal nature, each with multiple pages totaling approximately 30 pages, entitled "To Do Lists" on her personal drive on her work computer." For example, a to-do list saved to her work computer on September 11, 2014, included this entry:

> 8/14/14 – Thursday, 7:00 – 8:00pm both were at their own homes, he had Escape in driveway instead of garage; he opened several unopened email in gmail this day; opened email I sent from kimberlyjackson807@yahoo.com at 10:25 pm sent it at 4:13 pm; 10:26 pm he opened email from [S] again sent on 6/11/14, he opened zoo email at 10:28 pm sent by me on 6/9/12;

19

> 10:37pm he opened email from me part of Hallmark exard chain sent 6/3/12 opened 2nd time at 10:39. [sic].

Wallis's termination documentation also includes statements she made to her employer when confronted with the personal to-do lists saved to her work computer.[3] These documents *bolster*, rather than undermine, the State's case against her. These entries into Wallis's employment records likewise undermine her argument before this Court that her employment records provide a partial alibi or undermine the testimony of the victims.

Accordingly, the motion court did not clearly err when it found that Trial Counsel's performance was not deficient. We agree that Trial Counsel's decision to not investigate Wallis's employment records further or offer such records at trial was an exercise of reasonable professional judgment in light of the evidence in this case. Wallis has not satisfied her burden in proving that her employment records would have aided in her defense. And, even if Wallis had met her burden of demonstrating her Trial Counsel's performance was deficient, she cannot prove that she was prejudiced by her Trial Counsel's performance. For these reasons, Wallis cannot demonstrate a reasonable probability that, but for Trial Counsel's performance, the outcome of her trial would have been different given the overwhelming evidence presented by the State. Point I is denied.

---

[3] Her termination document states that when confronted with the to-do lists, Wallis made the following statement: "No one is that stupid. If I stalked someone, I'm not going to leave a log about it."

## CONCLUSION

The motion court did not clearly err in denying Wallis's post-conviction motion. The motion court's judgment is affirmed.

_____
W. DOUGLAS THOMSON, JUDGE

All concur.